Application of the OKLAHOMA TURNPIKE AUTHORITY for the Approval of the Issuance of Turnpike Revenue Bonds of the Authority for Defraying the Cost of Projects on the Southwestern Turnpike and on the Eastern Turnpike.

No. 39359.

Supreme Court of Oklahoma.

Jan. 26, 1961.

Rehearing Denied Feb. 14, 1961.

Application for Leave to File Second Petition for Rehearing Denied March 1, 1961.

Mitchell, Pershing, Shetterly & Mitchell, New York City, Looney, Watts, Looney, Nichols & Johnson, Norman E. Reynolds, Oklahoma City, Robert L. Wheeler, Tulsa, R. L. Vaughan, Oklahoma City, for Oklahoma Turnpike Authority.

Charles Nesbitt, James C. Hamill, Oklahoma City, Mack Braly, Ada, for protestant, Bill Hoover.

Hugh M. Sandlin and J. C. Daugherty, Holdenville, for protestants, Avard Hudson, William H. Wilson, O. P. Phillips, Norman Nickell, Roty T. Oliver, Bill Boyce, Dwight Peck, M. B. Hamby, Harold McKinnon, John Morgan, M. J. Hughey, John M. Rasberry, O. O. Wilcox, M. A. Spitler, Boyce D. Blackburn and Jack W. Herring.

Charles B. Steele, Okmulgee, O. E. "Pete" Richeson, Henryetta, amicus curiae.

WELCH, Justice.

The Oklahoma Turnpike Act of 1959, House Bill 932, of the 1959 Legislature, 1959, became effective on the 16th day of July, 1959.

It was provided in the second paragraph of Section 5 of the Act, 69 O.S.Supp. § 668, that:

"Immediately upon the passage and approval of this Act, the Oklahoma Turnpike Authority shall file an application with the Supreme Court, under the procedure set out above, for a determination of the validity of such Trust Fund and the earmarking of revenues thereto, the validity of a pledge thereof by the Authority as provided in this Act, and any other questions as to the constitutionality or validity of this Act that may be brought before the Supreme Court, and exclusive, original jurisdiction is hereby conferred upon the Supreme Court to hear and determine such application. * * *"

The "procedure set out above" relates to the giving and publishing of notice, advising of the unrestricted right of protest, fixing the time allowed therefor and naming the hearing date. This detail was set out in the first paragraph of section 5 and need not be copied herein.

The Legislature had authority to confer this additional jurisdiction on the Supreme Court by reason of the provisions of the Constitution of Oklahoma, Article 7, Section 2, which generally states the original jurisdiction of the Supreme Court and provides that the Supreme Court may exercise such other and further jurisdiction as may be conferred upon it by law.

Pursuant to the above quoted provision, the applicant, Authority, filed such an application for the determinations stated. Due notice was given. Protest was filed by Perry J. Baker and hearing was had at which both Authority and protestant appeared and participated by counsel.

After final hearing this court decided the cause—348 P.2d 510.

In that case we held that the applicable Act, House Bill 932, of the 1959 Legislature, 1959 S.L. pp. 285–292, 69 O.S.1959, Supp. §§ 680–683, was in keeping with the Constitution of Oklahoma, and was not unconstitutional as to any of the points presented in that case, and we decided and answered nine specific questions there presented, all as shown by the cited decision.

Following that decision the Oklahoma Turnpike Authority, hereinafter referred to as "Authority" made provision by proper resolution for two bond issues of Turnpike Revenue Bonds for the construction of two toll turnpikes in Oklahoma; one bond issue for the Southwestern Turnpike Project in the sum of $59,000,000, and one bond issue for the Eastern Turnpike Project in the sum of $31,000,000. The purpose of these bond issues was to obtain funds to construct the Southwestern Turnpike Project from near Oklahoma City towards Wichita Falls, Texas, and to construct a specified portion of the Eastern Turnpike Project between a point near Tulsa and the Oklahoma-Texas Boundary Line.

This application seeks the approval of these bond issues and the answering of certain questions propounded or presented. The application was filed as an original action in this court pursuant to the provisions of the Act which authorizes the Authority to so proceed. By the Act exclusive original jurisdiction is conferred upon this court to hear and determine such application and the duty of the Court to determine such an action is set out in the Act.

As provided and required by the Act due notice of hearing on this application was given, stating the date the Authority would ask the Court to hear its application and to approve the Bonds. Such notice informed all persons interested that they might file protest against the issuance of the Bonds and be present and be heard and contest the legality thereof.

On timely appearances, protests were filed by Bill Hoover represented by Attorneys, Charles Nesbitt, James C. Hamill and Mack Braly; and by Avard Hudson, William R. Wilson, O. P. Phillips, Norman Nickell, Roty T. Oliver, Bill Boyce, Dwight Peck, M. B. Hamby, Harold McKinnon, John Morgan, M. J. Hughey, John M. Rasberry, O. O. Wilcox, M. A. Spitler, Boyce D. Blackburn and Jack W. Herring, represented by attorneys Hugh M. Sandlin and J. C. Daugherty; thereupon the court, as required by the Act, gave such application precedence over the other business of the court and fully heard the applicant and all protestants upon written briefs and oral presentation, and upon request to consider the specific questions propounded, with documentary showing of the various meetings and actions of the turnpike Authority and of the State Highway Department, considering the form of the Bonds and Trust Agreement incident thereto, and other documents involved.

By the law of course the bonds could not create any debt against the State, and that is shown on the face of the bonds as the law requires.

This 1959 Act generally followed Turnpike Legislation which has been passed upon and construed by this court in several cases: Application of the Oklahoma Turnpike Authority for the Approval of Bonds, 1950, 203 Okl. 335, 221 P.2d 795; Application of Oklahoma Turnpike Authority for Approval of Bonds, 1952, 206 Okl. 617, 246 P.2d 327, and Application of Oklahoma Turnpike Authority for Approval of Bonds, Okl.1954, 277 P.2d 176.

Many of the questions which might ordinarily arise as to the construction and maintenance and financing of turnpike construction have been answered in these former decisions, and under those decisions turnpikes have been constructed and in operation for a number of years. However, this 1959 Act contains some other provisions as to financing, construction and operation of turnpikes. While this 1959 Act is based upon the same general plan and purpose to finance and build additional turnpikes, the new or additional details of plan present specific questions to be here determined.

Upon the application of Authority, and the contentions of protestants, the several questions here presented for consideration and determination are numbered and treated consecutively for convenience and to meet the method of presentation.

For ease of reference the terms "Enabling Act", "Southwestern Turnpike Project", "Eastern Turnpike Project", "Southwestern Route", "Eastern Route", "Bonds", "Turnpike Revenue Bonds", "Sinking Fund", "Trust Fund" and "Trust Agreement" in this opinion are intended to have the same meaning as the same terms, respectively, have in the Application, briefs and Trust Agreement of the Authority.

The First Question posed by applicant is whether the official actions and proceedings of the Authority respecting the authorization and the approval of the location, construction and financing of the specified Southwestern Turnpike Project and the specified Eastern Turnpike Project, and the authorization and issuance of the Bonds and the authorization and delivery of the Trust Agreement, and the provisions of the Trust

Agreement, are valid and in conformity with the Enabling Act and other applicable law.

The Authority is fully authorized to construct the Southwestern Turnpike Project and the Eastern Turnpike Project. Section 651 of the Enabling Act provides as follows:

"In order to facilitate vehicular traffic throughout the State and remove the present handicaps and hazards on the congested highways in the State, and to provide for the construction of modern express highways embodying every known safety device including center divisions, ample shoulder widths; longsight distances, the by-passing of cities and towns, multiple lanes in each direction, and grade separations at all intersections with other highways and railroads, the Oklahoma Turnpike Authority (hereinafter created) is hereby authorized and empowered to construct, maintain, repair, and operate turnpike projects (as hereinafter defined) at such locations as shall be approved by the State Highway Commission, and to issue turnpike revenue bonds of the Authority payable solely from revenues, to pay the cost of such projects."

Section 655(e) of the Enabling Act provides as follows, vesting power:

"To construct, maintain, repair and operate turnpike projects and highways, with their access and connecting roads, at such locations and on such routes as it shall determine to be feasible and economically sound; provided that until specifically authorized by the Legislature, the Authority shall be authorized to construct and operate toll turnpikes only at the following locations: * * *

"(2) That part in Oklahoma of a turnpike between a connection with the Turner Turnpike near the Oklahoma City Terminus and Wichita Falls, Texas, or any part of such turnpike; provided the northern terminus of said turnpike, or a gate, shall be located on or West of May Avenue and within three (3) miles of the Will Rodgers Airport; provided further, the Oklahoma Turnpike Authority and the Oklahoma Department of Highways are hereby authorized to enter into an agreement for the construction by the Department of Highways of a four-lane, divided, toll-free bridge on a United States or State Highway across the South Canadian River South or West of Will Rodgers Airport and west of the north-south line of May Avenue, with one-fourth (¼) of the cost of said bridge and the approaches thereto to be paid by the Oklahoma Turnpike Authority and the remaining three-fourths (¾) to be paid from State and Federal-Aid Funds; and in the event said bridge is constructed in this manner then said Turnpike gate or terminus may be south of said bridge and more than three (3) miles from said airport; provided further, that the turnpike shall run within two (2) miles of the city limits of Chickasha.

\* \* \* \* \* \*

"(4) A turnpike, or any part or parts thereof, beginning at the Oklahoma-Texas State Boundary Line, and extending North on a route lying East of the Cities and Towns of Wilson, Maysville, Norman and Oklahoma City, and West of the Eastern State line of Oklahoma to a connection or connections between the Turner Turnpike and the south side of the Arkansas River, then in the direction toward the Texas border in the most feasible and economical route. Provided, further, that the revenue bonds to finance the construction of the Turnpike authorized by this paragraph shall not be issued until after or simultaneously with the issuance of the revenue bonds to finance the construction of the Turnpike authorized by paragraph (2) of this Section, or firm and properly secured arrangements have been made for the financing of both Turnpikes."

The Southwestern Turnpike Project consists of two parts of the turnpike specifically authorized pursuant to clause (2) quoted above and the Eastern Turnpike Project is a part of the turnpike specifically authorized under clause (4) quoted above. The Enabling Act expressly authorizes the construction of "any part" of the Southwestern Route and "any part" of the Eastern Route.

Section 659 provides, in part, as follows:

"The Authority is hereby authorized to provide by resolution, at one time or from time to time, for the issuance of Turnpike revenue bonds of the Authority for the purpose of paying all or any part of the cost of any one or more Turnpike projects, and the Authority may in its discretion where it finds that it would be economical and beneficial to do so, combine two or more, or any part thereof, or all of its proposed projects into one unit and consider the same as one project to the same extent and with like effect as if the same were a single project. The principal of and the interest on said bonds shall be payable soley from the funds herein provided for such payment. The bonds of each issue shall be dated, shall bear interest at such rate or rates not exceeding five per centum (5%) per annum, shall mature at such time or times not exceeding forty (40) years from their date or dates, as may be determined by the Authority, and may be made redeemable before maturity, at the option of the Authority, at such price or prices and under such terms and conditions as may be fixed by the Authority prior to the issuance of the bonds. The Authority shall determine the form of the bonds, including any interest coupons to be attached thereto, and shall fix the denomination or denominations of the bonds and the place or places of payment of principal and interest, which may be at any bank or trust company within or without the State. The Bonds shall be signed by the Chairman of the Authority, and the official seal of the Authority shall be affixed thereto and attested by the Secretary and Treasurer of the Authority, and any coupons attached thereto shall bear the facsimile signature of the Chairman of the Authority. In case any officer whose signature or facsimile of whose signature shall appear on any bonds or coupons shall cease to be such officer before the delivery of such bonds, such signature or such facsimile shall nevertheless be valid and sufficient for all purposes the same as if he had remained in office until such delivery. All bonds issued under the provisions of this Act shall have and are hereby declared to have all the qualities and incidents of negotiable instruments under the negotiable instruments law of the State. The bonds may be issued in coupon or in registered form, or both, as the Authority may determine, and provisions may be made for the registration of any coupon bonds as to principal alone and also as to both principal and interest, and for the reconversion into coupon bonds of any bonds registered as to both principal and interest. The Authority may sell such bonds in such amounts and in such manner, either at public or private sale, and for such price as it may determine to be for the best interest of the State, but no such sale shall be made at a price so low as to require the payment of interest on the money received therefor at more than five (5%) per centum per annum computed with relation to the absolute maturity of the bonds in accordance with the standard tables of bond values, excluding, however, from such computation the amount of any premium to be paid on the redemption of any bonds prior to maturity."

◼ The actions and proceedings of the Authority are adequately shown by minutes of meetings, and by documents executed or approved by Authority. All this showing is

ample to direct an affirmative answer · to this first question.

The protestants contend that the Authority was not justified in finding that the Eastern Turnpike Project alone was "feasible and economically sound," or in finding that the Southwestern and Eastern Turnpike Projects as a unit were "feasible and economically sound."

■ It is true the law above quoted contemplates that turnpikes or portions thereof should be constructed only where Authority deemed feasible and economically sound, but determination thereof is exclusively in the discretion of Authority.

It is conceivable that an error might occur either way. The Authority might by timid caution too long forego such a construction, though specifically within legislative contemplation, on the erroneous thought it was not feasible. Or the Authority might conclude such a construction to be feasible, which would require more time after construction than expected to fully demonstrate feasibility and economic soundness.

This merely demonstrates that the Authority, like other agencies or entities, is not infallible, but it points to the true rule to guide the present consideration. That is that the Authority should observe the best tests, checks, studies and reports available or obtainable in a persistent effort to thoroughly test feasibility and economic soundness, and then apply its official discretion.

Then it is for the Authority to say whether it is satisfied that the proposal is feasible and economically sound.

It appears to us from the record that the Authority so proceeded in this instance, and we cannot say at all that its conclusion was not justified.

We answer this first question in the affirmative.

■ The Second Question is whether the holders of the Bonds have so long as any of the Bonds are outstanding, an accrued ·or vested contract right in and to an exclusive pledge by the Authority under the Trust Agreement of deposits accumulated in the Trust Fund for making up any deficiency in the moneys available to meet interest requirements on the bonds issued under the provisions of the Trust Agreement, as provided in Section 683 of the Enabling Act, and for the payment of interest on the Bonds as it becomes due and payable during the period of construction as specified in Section 404 of the Trust Agreement.

■ The protestant herein apparently takes the position that to allow the Bondholders to have a vested contract right to the deposits accumulated in the Trust Fund creates a debt or obligation against the State in violation of Article 10, Section 23 of the Oklahoma Constitution. However, we cannot agree with this contention.

Under the Act it is not the credit of the State that is to be considered in the pledge, it is the deposits that accumulate in the Trust Fund as they accumulate, nor is it any particular portion of the gasoline tax that is being pledged under the Act, since the pledge does not attach to any part of the gasoline tax until it is collected and its proceeds deposited in the Fund, and under said Act, then only that portion of the gasoline tax computed to have been paid on gasoline used in traveling upon the turnpikes is deposited in the Trust Fund. Therefore this pledge is limited to the funds actually accumulated by apportionment of motor fuel tax. These funds may be large or small, based upon the use of the Turnpikes by the public. For example, should the public cease to use the turnpikes for any reason, then under the Act no portion of our gasoline tax would be subject to the pledge, nor would the pledge constitute a debt against the State.

Section 683(b) clearly provides that the deposits in the Trust Fund, as the same accumulate, may be expended or pledged by the Authority as it may deem proper. We construe this to mean that the Authority may pledge said deposits which have accumulated in the past or which will accumulate in the future, without in any way creating a debt against the State. Accord-

ingly, the granting under the Trust Agreement of an exclusive pledge securing all the Bonds that may be issued to complete the turnpikes presently authorized under the Enabling Act is both reasonable and consistent with the law and decisions in the several Turnpike cases heretofore decided.

Turnpikes have been held to be public highways. Application of Oklahoma Turnpike Authority, 203 Okl. 335, 221 P.2d 795. The above use of the stated portion of motor fuel tax funds is therefore used for public highway construction, and in fact is a use for public highway purpose.

Therefore, for the reasons stated, and under the terms and provisions of the Act before us, we answer this second question in the affirmative.

The Third Question is whether the holders of the Bonds have, so long as any of the Bonds are outstanding, an accrued or vested contract right in and to the continued apportionment to the Authority by the State of Oklahoma each calendar month of 97% of an amount equal to the motor fuel excise taxes computed on 97½% of the total gallonage of all fuels consumed during the calendar month in which the tax being apportioned accrued on all Oklahoma Turnpike projects, and the continued deposit in the Trust Fund established pursuant to the Enabling Act of the full amount of each such apportionment until the balance in the Trust Fund reaches the statutory maximum, all in the manner and to the extent provided in the Enabling Act; provided, however, that no right shall thereby be vested precluding the Legislature of the State of Oklahoma from repealing, nullifying, reducing, maintaining at its present rate or otherwise changing the levy or the rate of levy of such motor fuel taxes.

In former Turnpike legislation all money collected as tolls for travel upon the Turnpike was placed in a General Turnpike Trust Fund to be used to pay for construction and maintenance of the Turnpike. This 1959 Act would create a separate segregated Trust Fund to be created by and contributed to by allocation of a stated portion of the motor fuel tax collected on motor fuel consumed on all Oklahoma Turnpike Projects, with limitation on the aggregate amount of such allocations, and with provisions for the contingent use of this fund by Authority, and with provisions for repayment to this fund of any money so withdrawn therefrom by Authority.

We construe the intent of the Legislature, in its enacting the 1959 Amendment to the Enabling Act with reference to the apportionment of motor fuel taxes and the establishment of the additional Trust Fund, to be for the purpose of facilitating the construction of the Turnpikes authorized under Section 655(e) (2) and (4) of said Act. In order to finance such construction, and thereby carry out the statutory objective it apparently seemed to be necessary or desirable to provide for the continued apportionment of the stated portion of collected motor fuel taxes to the Authority for this segregated Trust Fund so long as any of the Bonds are outstanding in accordance with Sections 680 to 683. It is obvious that the Legislature intended this to be done and it is so provided in sub-section Section 680, as follows:

(a) "Beginning with the first apportionment of motor fuel taxes made after the passage and approval of this Act, and until all turnpike revenue bonds hereafter issued by the Oklahoma Turnpike Authority and the interest thereon shall have been paid, or a sufficient amount for the payment of all such bonds and the interest thereon shall have been set aside in trust for such purpose, the Oklahoma Tax Commission shall each month determine an amount equal to the motor fuel excise taxes computed on ninety-seven and one-half per cent (97½%) of the total gallonage of all fuels consumed, during the calendar month in which the tax being apportioned accrued, on all Oklahoma Turnpike Projects and apportion a sum equal to said amount from all gasoline tax collections as follows:

"Ninety-seven per cent (97%) of such amount to the Oklahoma Turnpike

Authority and three per cent (3%) to the Oklahoma Tax Commission Fund, after which apportionment all other apportionments of motor fuel excise taxes shall be made according to existing or subsequently enacted apportionment laws. Provided that apportionments herein required to be made to the Oklahoma Turnpike Authority shall not in any fiscal year exceed One Million Dollars ($1,000,-000.00) * * *

"(b) If at the time of each monthly apportionment required herein there shall be a balance in the Trust Fund created by this Act equal to three (3) years annual interest on all Turnpike bonds on all turnpikes hereafter financed, or prior to the issuance of any such bonds there shall be a balance in the Trust Fund created by this Act in excess of Four Million Dollars ($4,000,000.00), the Oklahoma Tax Commission shall in said month make no apportionment to the Oklahoma Turnpike Authority of motor fuel taxes but shall apportion the same according to previously existing or subsequently enacted apportionment laws."

Section 683 provides in part as follows:

(a) "The Oklahoma Turnpike Authority shall segregate and hold such motor fuel excise taxes apportioned to it by this Act in trust for the uses and purposes herein provided.

"(b) The deposits in this Trust Fund, as the same accumulate, may be expended or pledged by the Oklahoma Turnpike Authority, as it may deem proper, either in whole or in part, for making up any deficiency in the moneys available to meet interest requirements on Turnpike Bonds hereafter issued and for the payment of necessary expenses in the financing of additional Turnpikes, provided, that such expenses of financing shall not exceed on the Southwest Turnpike the sum of Twenty-five Thousand Dollars ($25,000.00) or on the Eastern Turn-

pike the sum of Fifty Thousand Dollars ($50,000.00), not more than ten per cent (10%) of which sums shall be used as attorneys' fees, and provided, that any funds expended as permitted herein shall, upon payment of all interest and principal of all bonds issued hereunder, and before delivery of any said Turnpike to the State of Oklahoma Department of Highways, be replaced in said trust fund by said authority, and upon the completion of said reimbursement, said trust shall terminate and the balance in said trust fund shall be delivered to the State of Oklahoma Department of Highways."

We specifically held this Act to be valid and to involve no violation of the Constitution in Application of Oklahoma Turnpike Authority, Okl.1960, 348 P.2d 510.

Thus by present laws the motor fuel tax is established and definite and so is the apportionment of the proceeds thereof, including the apportionment of this portion to Authority, and under existing laws it is contemplated that there will continue to be a motor fuel tax with apportionment of the proceeds or collections thereof as now provided.

However, there is nothing in the law 69 O.S.Supp.1959 § 683(a) and (b) to guarantee that the future Legislatures must maintain the same motor fuel tax or the same apportionment of the proceeds or of the collections thereof.

█ It therefore becomes apparent that the Turnpike Authority is inviting this court to make guarantees that are not made by the legislation under consideration. Having concluded that the Legislature has not given the bondholders a vested right in, or a guarantee, that future Legislatures must maintain the same motor fuel tax or the same apportionment of the proceeds it follows that we must, and do, hold that the bondholders will not have an accrued or vested contract right in and to the maintenance of the same motor fuel tax or the same apportionment thereof.

We further hold, however, that the bondholders will have a vested right to any funds that have been in the past or are in the future deposited or accumulated in the Trust Fund from this source.

The Fourth Question is whether the holders of the Bonds have, so long as any of the Bonds are outstanding, an accrued or vested contract right in and to an exclusive pledge under the Trust Agreement of the revenues of the "paid-out projects" as provided in Section 667 of the Enabling Act and the continued operation of said "paid-out projects" as toll facilities under said Section.

Section 7 of the 1959 Act, 69 O.S.Supp. § 655, sub-division (e) in paragraph numbered (2) for the construction of the "Southwestern Turnpike" and the bridge across South Canadian River, and in paragraph numbered (4) for the construction of the "Eastern Turnpike." The next paragraph of the Act provides as follows:

> "The Agreement or Agreements for financing the Turnpikes authorized by Paragraphs (2) and (4) of this Section may contain a provision that tolls shall continue to be charged on all Turnpikes until the bonds, and the interest thereon, of all Turnpikes have been fully paid off, and provision that the revenues from any of the Turnpikes in excess of its operating and maintenance costs and sinking fund and other reserve requirements shall be used to pay the obligations of the other Turnpikes."

This combining of sources of revenue from all turnpikes to pay for all turnpikes is similar in principle as was done when the revenue from all State Park facilities was combined to pay for all State Park facilities and improvements, which was by this court approved in Application of Oklahoma Planning and Resources Board case, Okl., 274 P.2d 61.

All Turnpikes authorized are to be used for public highway purposes therefore all tolls collected are being used for this purpose.

This plan appears to the court as being beneficial to the State by hastening the time when all Turnpikes may be eventually paid for and turned over to the State Highway Department. This will leave more funds available for use on other public highways, while those using any of the Turnpike System will bear the financial burden of maintaining and paying for the entire System. Furthermore, it is a means by which an improved highway system may be accomplished without using revenue obtained from those who are non-users of the Turnpikes.

■ The authorization granted the Authority by the Legislature under Section 655, subsection (4) or paragraph (e) to continue charging tolls on all Turnpikes until bonds and interest on all Turnpikes were fully paid off, and the revenues therefrom in excess of operating and maintenance costs, sinking fund and other reserve requirements, to be used to pay the obligations of other Turnpikes, is a legal authorization. Such authorization to pledge revenue received from the use of a state owned facility has been upheld by this court in Application of Oklahoma Planning and Resources Board, supra.

The last above quoted statutory provision was specifically upheld in determining the sixth question in our former decision in Application of Oklahoma Turnpike Authority, Okl., 348 P.2d 510. See also the Kentucky Turnpike case [Turnpike Authority of Ky. v. Wall], Ky., 336 S.W.2d 551.

■ Therefore for the reasons stated, and under the terms and provisions of the Act before us, we answer this fourth question in the affirmative.

■ The Fifth Question posed by applicant is whether the holders of the Bonds have, so long as any of the Bonds are outstanding, an accrued or vested contract right in and to the requirement in the Trust Agreement that investments of moneys in the Trust Fund shall be confined exclusively to obligations or securities of the United States of America or obliga-

tions or securities the principal of and interest on which are unconditionally guaranteed by the United States of America.

Section 602, as revised, of the Trust Agreement with reference to the investment of moneys deposited in the Trust Fund provides:

"An amount of the moneys held for the credit of the Turnpike Trust Fund equal to twelve (12) months' interest on all bonds then outstanding (or all such moneys if the amount then held for the credit of said Fund shall be less than such twelve (12) months' interest) shall at all times, as nearly as may be practicable, prior to the second interest payment date after the construction of the Southwestern Turnpike Project shall be completed, be invested and reinvested by the Authority in Government Obligations which shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, not later than the interest payment date next succeeding, and after such second interest payment date following the completion of such construction, be invested and reinvested by the Authority in Government Obligations which shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, not later than three (3) years after the date of such investment."

It is provided in Section 101 of the Trust Agreement that the term "Government Obligations" means direct obligations of the United States Government or obligations guaranteed by the Government as to both principal and interest.

Legal permission to make such investments is found in Statute 69 O.S.Supp. § 683(d) which provides:

"The Oklahoma Turnpike Authority is hereby authorized to invest all or any part of such Trust Fund in securities of the United States of America."

This statute and recognized good business practice would seem to fully author-ize the inclusion of above quoted Section 101 of the Trust Agreement. When it is so included and bonds are sold on that basis, among others, it would follow that bond buyers would have the right to rely thereon.

Reiterating in part appropriate language in Application of Oklahoma Turnpike Authority, Okl.1960, 348 P.2d 510, we here say as to Section 101 above quoted we think it is the universal practice to authorize various public agencies as well as others to make investments in securities of the United States of America. This means of course in their discretion as to when and how much money may be so invested so as not to restrict the availability of such funds when they are needed by the Authority for proper expenditure purposes.

We do not observe that either of the protestants has specifically questioned the here involved section of the Trust Agreement or has challenged an affirmative answer to this question. We do not observe any basis of which the point would be vulnerable to such an attack or open to question.

We answer this fifth question in the affirmative.

In Proposition Six we are required to consider the legality and validity of two certain agreements of the Oklahoma Department of Highways. The affirmative of such legality is here presented by applicant while the negative thereof is urged by protestants.

The two written agreements are a part of the application. One as Exhibit E. provides for construction by Department within the time therein specified after sale of Turnpike Bonds of certain specified highway facilities on or near the general southwestern route which with the Southwestern Turnpike Project will merge or meld into a symmetrical whole an important and extensive artery of traffic in the State.

The other agreement Exhibit G. provides for specified construction of the general eastern route which so far as the legal

questions involved may be said to be similar construction of highway facilities.

These facilities will be used by Turnpike patrons, but will also be freely used by other motorists not Turnpike patrons.

These facilities, like all public highways in the State, will permit and assist any one to approach near to these toll Turnpikes so as to enter upon and into the access roads, entrances and gates of Turnpike. These facilities will, with all other public highways of the State, permit and aid travelers who have used the Turnpike and passed through the gates and exits and left Turnpike premises, to travel on to any destination dictated by their needs or desires. They are not of course a part of the Turnpike, and are to be constructed by Department from public highway funds as other general public highway facilities.

These facilities will play their part in co-ordinating the entire highway system of the State with the Turnpikes, each in a way aiding or adding to the use of the other. For that matter before we had Turnpikes nearly every highway aided or added to the use of many of nearly all other highways though not a part thereof. Nearly all city streets give some aid or addition to travel on many or nearly all other streets.

Based apparently, or in part, upon the fact that these facilities will substantially aid Turnpike travelers the protestant contends that these facilities will constitute lead roads or access roads to the Turnpikes here involved, and that they should be constructed and paid for by the Turnpike Authority, and therefore that it is illegal for the Highway Department to project such construction and to complete such construction out of the public highway funds.

The law provides, 69, O.S.Supp. § 655 (e) (4) as follows:

"All access roads interchanges, or lead roads connecting such turnpikes with existing highways must be built by funds furnished by the Turnpike Authority."

So the question occurs whether these highway facilities are to be included in the term of "access roads or lead roads" so connecting with such Turnpike.

The nature and location of these facilities are shown by the drawings thereof and by the minutes, actions, resolutions and agreements of the Highway Commission. They are in the vicinity of the Turnpikes. They connect directly with the general highway system of the State. They are so constructed that Turnpike patrons may pass over these facilities in going to or departing from the Turnpike. But it is clearly shown that such facilities are also usable by travelers between various points in the State who do not enter the Turnpike premises at all. It is from those facilities, as from many other State Highways, that persons enter upon the Turnpike premises by driving on to the Turnpike lead or access roads and thence to and from the entrances and gates of the Turnpike.

We construe the terms access roads and lead roads forming turnpike connections to mean those travelways which are essential to completion of the turnpike itself, and which are to be maintained and controlled by the Turnpike Authority. The law provides, 69 O.S.Supp. § 655 (in part):

"The Authority is hereby authorized and empowered * * * [e] to construct, maintain, repair and operate turnpike projects and highways, with their access and connecting roads, * * *."

The facilities here involved are free to public use. They are not in any manner to be controlled or operated by the Turnpike Authority. If they are not truly such public roads, separate from the Turnpikes, then it would necessarily follow that they would be controlled and operated by the Turnpike Authority, and therefore be a part of the Turnpike itself.

As supporting our conclusion here we observe that, specifically by law, the Federal Government will not contribute to the construction of any part of a toll Turnpike

or facility thereof (23 U.S.C.A. § 301.), but each highway facility here proposed to be constructed by the Highway Department is such construction as will have participation by the Federal Government and of federal funds with federal approval of the project as a proper and useful highway facility, separate from the Turnpike Project.

In those actions by the Highway Department we observe nothing more than wholesome plans and purposes, within full legal authority, to cooperate in the planning and projecting of proper steps looking towards building an overall substantial and complete highway system for the State.

It has been the policy of the State for fifty years, and it has continuously acted, step by step, to build such a comprehensive highway system. As always, it is the continuing province of the Highway Department in its discretion to build each year the type and location of highway facilities which it should build and which it can build with available state and federal funds. The fine results achieved stand as a testimonial to the diligence, and capable exercise of discretion, of those having to do with the planning and financing and construction of our numerous highway projects. It is quite apparent that the proposed facilities here involved will form a valuable addition to our already extensive highway system.

When the officials of the Highway Department in their discretion determine to project these facilities, as they have done here, we see no illegality in their promising or agreeing with the Turnpike Authority that they would construct these facilities.

We already have in operation in Oklahoma two toll Turnpikes, The Turner Turnpike between Oklahoma City and Tulsa, and the Will Rogers Turnpike between Tulsa and Joplin, Missouri, or to the Missouri line. Many state highways reach the vicinity of these turnpikes and the entrances and access roads and gates thereof. Nearly all highways in Central and Northeast Oklahoma directly aid patrons of these two Turnpikes, going to or from them yet all such highways are maintained and operated by the Highway Department separate from the Turnpikes or any control of the Turnpike Authority. To sustain protestant's contention here would be to hold or imply that much of such highway construction would constitute access or lead roads to those two existing toll Turnpikes.

We are convinced that the Legislature intended to provide and did provide only that the Turnpikes and those entrances, access roads and lead roads used exclusively by Turnpike patrons should be the facilities to be constructed exclusively by the Turnpike Authority.

Then the Highway Department in the future, as in the past could exercise its discretion in projecting and constructing general public highway facilities for the best needs of the general traveling public, whether Turnpike patrons or non Turnpike travelers.

To us the agreement of the Highway Department means that in their discretion they have determined to build these stated facilities and they have planned that they can and will build them in the time stated.

This does not mean that the Highway Department must overlook or cast aside every other need or emergency that might arise as to other highways or bridges in order to complete those projects within the times stated. It means that they will do so in that time if funds are available therefor and to the extent that they can properly expend funds on those projects. We have no doubt that good and proper motives prompted the projecting of these highway facilities, and that proper diligence and discretion will guide to the building of these projects as to the time element as well as to proper construction. The actions of the Highway Department and these agreements are within the discretion and power of the Highway Department and are legal and valid, to be performed of course within any limitation as to available funds or other legal provisions which might

enter into the time when the Highway Department should take either or any of the steps toward the completion of these highway facilities.

We answer this sixth question in the affirmative.

■ The Seventh Proposition presents the question whether the obligations assumed under said agreements by the Oklahoma Department of Highways to construct, and the construction by the Oklahoma Department of Highways, of the highway facilities referred to in said agreements in the vicinity of the Turnpike on the Southwestern Route and the Eastern Route and the bridges, with approaches thereto, over the South Canadian River and the Red River and the expenditure therefor of highways funds of the State of Oklahoma will result in making the Bonds issued by the Authority debts or obligations within the meaning of Sections 23 and 25 of Article X of the Constitution of Oklahoma, notwithstanding the fact that the construction of such highway facilities and the expenditure of such State Departments may benefit the Southwestern Turnpike Project and the Eastern Turnpike Project and patrons thereof and the holders of the Bonds.

While it is conceded that the construction of highway facilities referred to in the two Highway Department contracts will result in benefit to the two Turnpikes here involved, the contracts and said facilities do not involve any Highway Department obligations for direct aid to or construction of any part of the Authority's Projects. All Projects of the Turnpike Authority will be financed solely with the proceeds of the Bonds when and if they are issued and sold by the Authority.

Reference is made to the fact that the construction of these highway facilities will ultimately redound to the benefit of the purchasers of Turnpike Authority Bonds, but such benefits would be the same whether the Department of Highways constructs these or similar highway facilities under the terms of the Agreements in question

or in the absence of or outside the purview of such agreements.

In applicant's brief it is stated that, as has been indicated above, the contractual obligation of the Department of Highways to construct the highway facilities covered by such agreements is conditioned upon its having legally available adequate funds for such purpose.

We have already so construed the agreements in former statements in this opinion.

It surely could not be contended, and so far as we observe from the briefs and oral arguments it is not contended, that these Agreements impound or bind or in any manner affect any State Highway construction funds now on hand, or any specific funds which may come into being at any specific time in the future. The time is uncertain when the Highway Department would or should commence construction of any of these facilities involved in these agreements. When that time does come, if it comes, then the Highway Department would and should commence such construction if it had on hand "legal available adequate funds for such purpose." Likewise the work on such facilities should proceed in due course within the financial and/or other legal limitations, or within the official discretion of the Highway Department in the discharge of its overall duties in the construction and operation of the Highway System of the State.

It is stated in applicant's brief as follows:

"The obligation of the Department of Highways under said agreements is to construct the highway facilities within the time stipulated but only to the extent that funds therefor are available. No obligation is imposed thereunder to procure funds in the future to carry out the highway work."

It could not be successfully contended that if the Department of Highways is prevented by reason beyond its control from completing these highway facilities within the time stipulated that the Department or the State would be subject to suit for dam-

ages or be amenable to other legal action as might be true between individual contracting parties.

It is true, as further stated in applicant's brief that the contractual obligation of said Department under said agreements is merely to build public highway facilities that are not part of any Turnpike Project of the Authority with legally available appropriated funds.

No more can be said of these Agreements than that the obligation assumed by the Highway Department is to use all proper legal available means to effect completion of the projects within the time indicated. There is the implication in the resolutions and agreements of the Highway Department that in its present best judgment there will be funds and capabilities available to complete the projects within the specified times. Of course the Highway Department has and will have authority to make binding contracts as to the construction of these highway facilities as affects or binds money on hand legally available for such purposes, as of the time of the making of any such contracts. However, the contracts here involved do not constitute a completed specific contractual obligation so as to create any debt within the meaning of Sections 23 and 25 of Article X of the Constitution of Oklahoma.

We therefore answer this seventh question by our conclusion that by these agreements no debt is created contrary to law or contrary to the sections of the Constitution referred to, nor do these agreements result in making these Turnpike Revenue Bonds debts or obligations prohibited by the Constitution. The agreements therefore must be considered, at most, as a moral obligation and not a legal obligation to carry out the terms thereof.

█ The Eighth Proposition presents the question whether the Authority's pledge of deposits in the Trust Fund may be lawfully confined to secure Bonds issued under the terms of the Trust Agreement, excluding from the benefits thereof bonds subsequently issued for other turnpike projects that may hereafter be authorized by the Legislature.

This question was discussed and perhaps decided in connection with applicant's second proposition above.

This Trust Agreement sets up this pledge as an exclusive pledge which would preclude the use of this money, accumulated in the Trust Fund within the stated limits as a pledge or security for subsequent revenue bonds which might be issued in the future, that is after the bond issues here involved, for Turnpike Projects which might be authorized by the Legislature at some future time.

Of course this pledge is of substantial value to the purchasers of bonds on these two Turnpike Projects. That value would be greatly diminished if subsequently other bond issues without any limitation in amount could be also granted the benefit or equal benefit of this same pledge. Whatever pledge is made covering principal or interest of the bonds here involved the purchasers of these bonds are entitled to rely thereon, and the same money so pledged cannot be otherwise used as a pledge until purchasers of these bonds are paid and satisfied.

If the Legislature and Turnpike Authority engage in building other and additional turnpikes, they might make some secondary pledge of this same money, or might pledge money in desired sums above the present requirements and limitations, but as to the pledge for these bond issues here involved it will be necessary that full priority be preserved.

We do not observe any specific contest of this point by contestants nor do we observe that the point would be vulnerable to attack.

We answer the eighth question in the affirmative.

█ The Ninth Proposition presents the question whether the provisions of the Trust Agreement combining, for financing purposes, into one unit and treating as a single project the Southwestern Turnpike Project, the Eastern Turnpike Project, and

any other project or projects on the Eastern Route for which bonds are issued under the Trust Agreement and establishing a single Sinking Fund for all such bonds, are valid and in conformity with applicable law, including particularly Section 659 of the Enabling Act authorizing the combining of two or more projects and Section 661 of the Enabling Act preventing the use of Sinking Fund moneys for the payment, purchase, or redemption of any bonds that have not been issued to construct the project from which such moneys were derived.

Section 659 of the Enabling Act reads as follows:

"The Authority is hereby authorized to provide by resoultion, at one time or from time to time, for the issuance of Turnpike revenue bonds of the Authority for the purpose of paying all or any part of the cost of any one or more Turnpike projects, and the Authority may in its discretion where it finds that it would be economical and beneficial to do so, combine two or more, or any part thereof, or all of its proposed projects into one unit and consider the same as one project to the same extent and with like effect as if the same were a single project. The principal of and the interest on said bonds shall be payable solely from the funds herein provided for such payment."

In conformity with the above-quoted statutory provision, the Authority in the Trust Agreement has provided for combining the turnpike projects financed under the Trust Agreement. The Southwestern Turnpike Project, the Eastern Turnpike Project and any other project or projects on the Eastern Route financed under the Trust Agreement are combined and are collectively called the "Southern Turnpikes." The form of bond at pages 11 and 12 of the Trust Agreement includes the following references to the combined project:

"The Agreement, in accordance with and as required by the Enabling Act, provides for the fixing, revising, charging and collecting by the Authority of tolls for the use of the Southern Turnpikes and the different parts or sections thereof and for revising such tolls from time to time in order that such tolls and other revenues will be sufficient to provide funds to pay the cost of maintaining, repairing and operating the Southern Turnpikes and to pay the principal of and the interest on all bonds issued under the Agreement as the same shall become due and payable, and to create reserves for such purposes. The Agreement also provides for the deposit of all such tolls and other revenues, over and above such cost of maintenance, repair and operation and reserves for such purposes, to the credit of a special fund, designated "Oklahoma Southern Turnpikes Interest and Sinking Fund" (herein called the 'Sinking Fund'), which fund is pledged to and charged with the payment of the principal of and the interest on all bonds issued under the Agreement."

Under Article V of the Trust Agreement, the Authority covenants to fix and place into effect a schedule of tolls sufficient to meet current expenses and maintenance and to provide for the required deposits to the credit of the Sinking Fund. Under Section 503 therein a special fund is created designated "Oklahoma Southern Turnpikes Revenue Fund" in which tolls and other revenues derived from the operation or ownership of every project undertaken under the Trust Agreement are to be deposited. The budget required to be prepared under Section 505 of the Trust Agreement embraces all of the projects upon a combined basis undertaken pursuant to the provisions of the Trust Agreement. Under Section 506 of the Trust Agreement the moneys in said Revenue Fund are to be held by the Trustee in trust and are subject to a lien and charge in favor of the holders of all the bonds issued and outstanding under the Trust Agreement.

Section 1307 of the Trust Agreement reads as follows:

"The Authority hereby finds and determines that it would be economical and beneficial to combine into one unit the Southwestern Turnpike Project, the Eastern Turnpike Project and any remaining part of the Eastern Route for which bonds may be issued under the provisions of this Agreement, and to consider the same as one project to the same extent and with like effect as if the same were a single project, and, as authorized by the Enabling Act, the same are hereby combined for financing purposes to the extent and with the effect set forth in this Agreement, including the establishment of a single sinking fund for the payment, purchase or redemption of all bonds issued under the provisions of this Agreement; provided, however, that nothing contained in this Agreement shall be construed as preventing the Authority from financing the Eastern Turnpike or any part thereof by the issuance of bonds which are not secured by the provisions of this Agreement and which are issued under the provisions of a separate trust agreement."

Section 507 of the Trust Agreement provides, in part, as follows:

"As provided in Section 1307 of this Agreement, a single special fund is hereby created and designated 'Oklahoma Southern Turnpikes Interest and Sinking Fund' (herein sometimes called the 'Sinking Fund'). There are hereby created three separate accounts in the Sinking Fund designated 'Bond Interest Account,' 'Reserve Account' and 'Redemption Account,' respectively. Another special fund is hereby created and designated 'Oklahoma Southern Turnpikes Reserve Maintenance Fund' (herein sometimes called the 'Reserve Maintenance Fund.)'

"The moneys in each of said Funds and Accounts shall be held by the Trustee in trust and applied as hereinafter provided with respect to each such Fund or Account and, pending such application, shall be subject to a lien and charge in favor of the holders of the bonds issued and outstanding under this Agreement and for the further security of such holders until paid out or transferred as herein provided."

By the above quoted statute 69 O.S.Supp. 1959 § 659, the Legislature specifically authorized the Turnpike Authority in its discretion to combine two or more turnpike projects or parts thereof into one unit. Surely this was a proper item for legislative action and the statute is plain.

It seems clear that the Authority may so combine these two projects, or if it could not sell bonds to finance these two projects as a unit, it could sell bonds and construct either one or the other of these two projects singly.

It should be noted that by law the Authority may not construct any Turnpike without legislative approval and action. The Legislature has specifically authorized the two Turnpikes formerly constructed, and now in operation, and the Legislature has specifically authorized the two Turnpike Projects here involved. No other or further Turnpike construction can be commenced until first authorized by subsequent legislative action.

Since the right and power of the Turnpike Authority to combine these two projects is so clearly established, we answer this ninth question in the affirmative.

█ The Tenth Proposition presents the question whether Section 212 of the Trust Agreement relating to the issuance of Turnpike Revenue Refunding Bonds is valid and in conformity with applicable law, including particularly the second sentence of Section 669 of the Enabling Act.

Section 212 of the Trust Agreement authorizes the issuance of Turnpike Revenue Refunding Bonds of the Authority which may be issued under and secured by the

Trust Agreement. These refunding bonds may be issued for the purpose of providing funds for paying at their stated maturity or redeeming prior to their stated maturity all of the outstanding bonds of any Series, including the payment of any redemption premium thereon.

69 O.S.1951 § 669, reads as follows:

"The Authority is hereby authorized to provide by resolution for the issuance of turnpike revenue refunding bonds of the Authority for the purpose of refunding any bonds then outstanding which shall have been issued under the provisions of this Act, including the payment of any redemption premium thereon and any interest accrued or to accrue to the date of redemption of such bonds. Each refunding issue shall be limited to the project in connection with which the bonds being refunded were issued and revenues pledged to pay any such refunding issue shall be limited to the revenue derived from said separate project. The issuance of such bonds, the maturities and other details thereof, the rights of the holders thereof, and the rights, duties and obligations of the Authority in respect of the same, shall be governed by the provisions of this Act in so far as the same may be applicable."

It will be noted that the second sentence of Section 669 refers to "separate projects." Since under the law the Turnpike Authority may now proceed with either the Southwestern Turnpike Project or the Eastern Turnpike Project, or by specific provisions of law may combine both such Turnpike Projects into one unit, either way in which the Authority proceeds it will be engaging in a single project or a "separate project" within the meaning of Section 669, supra. Therefore there could not be any inconsistency between the provisions of Section 212 of the Trust Agreement and the provisions of the Statute, Section 669, above quoted.

And having fully heard and considered this matter upon the pleadings of the parties and briefs of the parties and appearance and oral presentation by and on behalf of all the parties, the Court finds that as referring to the Turnpike Projects and Bond Issues here involved, the Turnpike Authority in all things proceeded within their legal authority and in conformity with applicable law; that the several questions proposed should be and they are hereby answered and determined as above set out in this opinion and decision; that all of the Turnpike Revenue Bonds here involved have been properly authorized in conformity with applicable law, and that when issued in accordance with applicable statutory law and this decision these bonds of Oklahoma Turnpike Authority, as to both or as to either of these two Turnpike Projects here considered, such bonds when issued in accordance with applicable statutory law and this decision and all of them will constitute valid obligations in accordance with their terms, and therefore the Court, by this opinion and decision hereby approves the bond issues here presented, as this Court is authorized to do by specific provision of law.

The Court hereby fixes a period of 5 days within which a petition for rehearing may be filed herein.

WILLIAMS, C. J., concurs specially.

BLACKBIRD, V. C. J., concurs specially by reason of stare decisis.

HALLEY, JOHNSON and JACKSON, JJ., concur.

IRWIN and DAVISON, JJ., concur in part and dissent in part.

BERRY, J., concurs by reason of Rule of Law in the case.

WILLIAMS, Chief Justice (concurring specially).

I concur in some phases of the majority opinion in this case because of my belief

that, as to those, such opinion announces or follows properly cognizable principles of the law of Oklahoma.

I feel constrained to concur with respect to at least one other portion of such opinion only because the law with reference to it was basically and in essence settled in a former decision of this court. See Application of Oklahoma Turnpike Authority, Okl., 348 P.2d 510, 518. In that case this court determined the validity of the very trust fund here involved, that revenues might be earmarked thereto, that they might be pledged, and further that the very Act here involved and its provisions authorizing financing and construction of the very Turnpikes here involved were constitutional and valid.

In paragraph 8 of the syllabus of the opinion in such former case, this court said, "The agreement or agreements for financing the two Turnpikes above referred to properly contain a provision that tolls shall continue to be charged on all Turnpikes until the bonds and the interest thereon, of all Turnpikes have been fully paid."

I did not then agree with this announced principle. Nor do I now. Nor do I agree with the answer to question IV in the present majority opinion reiterating such principle. See Article X, section 23, Oklahoma Constitution, of provision in part that: "The State shall never create or authorize the creation of any debt or obligation or fund or pay any deficit, against the State, or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid * * *."

However, I feel bound by that principle inhering in a republican form of government, that when the Supreme Court has decided a particular matter finally, the decision is binding. See 5B C.J.S. Appeal and Error § 1821 a and b, pp. 181, 190.

By Article VII, section 3 of the Constitution, it is provided, in part, "* * * A majority of the members of the Supreme Court shall constitute a quorum, and the concurrence of the majority of said court shall be necessary to decide any question. * * *"

The former decision settling this matter has long since become final. I therefore concur specially.

BLACKBIRD, Vice Chief Justice (specially concurring).

My individual views have never been in harmony with those expressed by the Majority on some of the questions involved here. However, in the previous case of Application of Oklahoma Turnpike Authority, Okl., 348 P.2d 510, involving The Oklahoma Turnpike Act of 1959 (Chap. 18c, S.L.1959, pgs. 283, 292) the Majority of my Associates expressed views that must be regarded as decisive on a number of the same, or similar, questions in this case. By so doing, they committed this court to determinations, which are binding upon other Members of this Court, regardless of conflicting personal views. See State ex rel. Murphy v. Johnson, 185 Okl. 651, 95 P.2d 99, 100. It is solely because of this, that I now concur in the Majority opinion in this case.

IRWIN, Justice (special concurrence in part; dissenting in part).

I specially concur in that portion of the Third Question which specifically holds that the holders of the outstanding bonds issued to build the Turnpike Projects will not have an accrued and vested contract right in and to the continued apportionment of a portion of the motor fuel tax as provided in the Act and will not have a vested contract right which would preclude a future legislature from repealing, reducing or otherwise changing the levy or rate of levy of the motor fuel tax, for these additional reasons.

Article X, Section 23, of our Constitution provides that the State shall never create or authorize the creation of any debt or obligation. Therefore, if any and all future legislatures were obligated to continue the apportionment of the motor fuel tax as provided in the Act for so long as

any of the bonds are outstanding, or a sufficient amount shall have been set aside in trust for such purposes, that portion of the Act attempting to bind or obligate the State, acting through its legislature to continue such apportionment, would be unconstitutional.

I concur in the Fourth Question for the reason the Application of Oklahoma Turnpike Authority, Okl., 348 P.2d 510, which construed the Act in question, specifically determined and established the rule of law that the revenues of the "paid out projects" could be pledged. (See my dissenting views expressed in 348 P.2d 510, relating to this specific question)

Proposition Six and Seven as set forth in the Authority's application are as follows:

Proposition Six is whether the said agreements between the Oklahoma Department of Highways and the Authority pursuant to which the said Department has agreed to undertake and complete within the time stipulated therein the portions of the Southwestern Route, including said bridges, with approaches thereto, over the South Canadian River and the Red River, and the portions of the Eastern Route described in *said agreements are valid and binding upon the parties thereto and otherwise in conformity with the Enabling Act and other applicable law and may performance of said Department's obligations thereunder be legally enforced against the Department of Highways by the Authority, the Trustee under the Trust Agreement or the holder of any of the Bonds?*

Proposition Seven is whether the obligation assumed under said agreements by the Oklahoma Department of Highways to construct, and will its construction of, portions of the Southwestern Route and the Eastern Route and said bridges with approaches thereto and the expenditure therefor of State of Oklahoma highway funds, which may benefit the Southwestern Turnpike Project and the Eastern Turnpike Project and the holders of the Bonds, result in making the Bonds issued by the Authority debts or obligations within the meaning of Sections 23 and 25 of Article X, of the Constitution of Oklahoma?

The obligations the State Highway Commission has agreed to undertake and complete within a specified time relate to the construction by the State Highway Department certain highway facilities, including bridges and approaches thereto, on or near the two turnpikes in question. In this connection, the Highway Commission, by resolution, agreed that upon sale of the revenue bonds the Highway Commission would proceed with the construction of the specified highways, including bridges and approaches thereto, and open the same to traffic within a certain time.

I concur in that portion of the majority opinion which holds that said agreements of the State Highway Commission are not binding upon the parties thereto and the performance of such agreements, contracts or commitments by the State Highway Department or the State Highway Commission may not be legally enforced by the Authority, the Trustees under the Trust Agreement or the holder of any of the bonds.

I concur for the reasons set forth in the majority opinion and also for these additional reasons.

In exercising its discretion in planning and projecting in the future a highway program, the State Highway Commission's authority and power to enter into valid and binding contracts is not only governed by Legislative enactments but such contracts must be within the confines of the Constitution.

Title 69 O.S.1951 § 27.7, provides that expenditures and obligations of the State Highway Commission cannot exceed the appropriations and that expenditures or contracts in excess of appropriations are void. Section 27.7 states:

"It is hereby declared to be the intent of the Legislature of this State that such Highway Commission, and the individual members thereof, shall so conduct and operate the affairs of

the Commission that no expenditures shall be made in any department in any fiscal year, or obligation contracted therefor, in excess of the specific amount appropriated therefor by the Legislature. *Any expenditure made, or contract of whatsoever nature entered into by said Commission in any one fiscal year, for any purpose, in excess of the amount appropriated therefor by the Legislature or allocated or contributed by the Federal Government, shall be considered and is hereby declared to be void and of no force and effect;* provided however, that a pledge of funds to match Federal aid shall not constitute a violation of this Section; provided further, that this Section shall become effective and be in full force and effect as of July 1, 1939. Laws 1939, p. 276, § 7."

The Constitutional limitations are expressed in Article X, Sec. 23, which, inter alia, provides:

"* * * Any department, institution or agency of the State operating on revenues derived from any law or laws which allocate the revenues thereof to such department, institution or agency, shall not incur obligations in excess of the unencumbered balance of surplus cash on hand * * * (Emphasis added).

"The State shall never create or authorize the creation of any debt or obligation * * * against the State, or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid * * *"

It is apparent that any contract entered into by the State Highway Commission in excess of its appropriations for any fiscal year is null and void and of no force and effect under the Legislative enactment and it would be in contravention of the Constitution for Highway Commission to incur obligations in excess of the unencumbered balance of surplus cash on hand.

The Authority does not contend or even suggest that the State Highway Commission has sufficient unobligated funds or a surplus of cash on hand for the fiscal year ending June 30, 1961, to construct the highway facilities it agreed to construct on or near the two turnpike projects in question. Therefore, if the contracts, agreements and commitments of the State Highway Commission are presently operative, that is, operative within the fiscal year ending June 30, 1961, they are null and void and of no force and effect as such contracts are specifically prohibited by Legislative enactment and the Constitution.

On the other hand, if the contracts are to become operative and effective after June 30, 1961, the contracts would be unconstitutional as such would be incurring obligations in excess of the unencumbered balance of cash surplus on hand and would be pledging and allocating funds to be appropriated by future legislatures. In effect, the Department of Highways, which Article XVI, Sec. 1 of the Constitution directs the legislature to establish, would be attempting to do that which the legislature could not do, namely, laying its mandate on a future legislature. In Boswell v. State, 181 Okl. 435, 74 P.2d 940, 947, this Court said:

"As we conceive it, the constitutional provisions dealing with the 'debt limit' of the state were adopted for the purpose of fixing the power and responsibility of legislation relating to the fiscal affairs of the state upon the existing legislative assembly, and to prevent one legislative assembly from laying its mandate upon a future one. The effect of these provisions is that one legislative assembly cannot guarantee the span of life of its legislation relating to the fiscal affairs of the state beyond the period of its biennium."

I can only conclude that if we construe the agreements or commitments made by the State Highway Commission to be contractual obligations, effective *immediately*

or to become effective in the future, they are null and void and of no force and effect as they would be in contravention of Legislative enactments and the Constitution.

On the other hand, if they are not contractual obligations which could be legally enforced, as set forth in the majority opinion, they have no more force and effect than any other road project contemplated to be constructed by the State Highway Commission.

Title 69 O.S.1959 Supp. § 655, subdivision (4), provides:

"All access roads interchanges, or lead roads connecting such turnpikes with existing highways must be built by funds furnished by the Turnpike Authority."

In my judgment there is insufficient evidence before this Court to consider whether or not the roads to be constructed by the State Highway Commission are access roads, interchanges, or lead roads connecting such turnpikes with existing highways.

I am authorized to state that Mr. Justice DAVISON concurs in the views herein expressed.

### Order Denying Motion for Rehearing and Motion to Vacate.

WILLIAMS, Chief Justice.

On October 17, 1960, this court entered its order denying the application of Protestant, Bill Hoover, for an order referring this case to a Referee of this court for the taking of evidence and testimony upon alleged questions of fact. Thereafter, and on October 21, 1960, the said Bill Hoover filed in this court a "Motion to Vacate and Set Aside Order Denying Application for Reference; and for Rehearing and Reconsideration Thereof." In said motion it is asserted that the application of the Turnpike Authority and the protests of Protestant and others raise numerous questions and issues of fact which are or may be controverted.

We carefully considered Protestant's motion prior to and in connection with our opinion on the merits in this case and on consideration of petition for rehearing concluded that there were no decisive and controlling issues of fact mentioned or presented which would make it necessary to refer the case to a Referee for the purpose of taking evidence and testimony.

Having concluded that there were no fact questions presented necessitating the reference of the case to a Referee it is ordered that the motion of Protestant, Bill Hoover, to Vacate and Set Aside Order Denying Application for Reference and for Rehearing and Reconsideration be, and the same is, hereby denied.

WELCH, Justice (dissenting to denial of rehearing).

I respectfully dissent to the complete denying of the petitions for rehearing. I am convinced that the answer to "The Third Question" as set out in the majority opinion is not wholly adequate. I agree with that answer as far as it goes in permitting maintenance and pledging of this segregated Trust Fund, but believe we should go further and fully answer this question in the affirmative.

That would more closely follow the legislative intent as clearly expressed in the Act, 69 O.S.Supp.1959, §§ 680, 682 and 683, and would recognize that revenue produced by using motor fuel on the turnpike system and paying a specified tax per gallon on motor fuel there used may be treated as turnpike revenue, with specific legislative sanction, and thus may be fully pledged as set out in Sec. 683, supra.

Sections 680 and 683 are copied in full in the majority opinion, also in our opinion in Application of Oklahoma Turnpike Authority, Okl., 348 P.2d 510, at pages 514 and 515, and we there stated the provisions of Section 682. In the body of the opinion in that decision, which was considering this identical Act, it was stated at page 515:

"When a motor vehicle travels over the turnpike, the Authority and every-

one else observes the complete propriety and legality of collecting a toll to apply to pay for the Turnpike. Since the same trip necessarily consumes gasoline on which the traveler pays a specific tax per gallon, the Authority urges there is equal propriety and legality in applying a legislatively stated portion of that motor fuel tax for possible permissive use to pay for the Turnpike."

And at page 516:

"Furthermore, if any money is spent by Authority out of the trust fund created with or from motor fuel taxes, it will only be a temporary use or expenditure since provision is made for its repayment into the fund by Authority.

"Turnpikes are public highways. Application of Oklahoma Turnpike Authority, 203 Okl. 335, 221 P.2d 795. The above use of the stated portion of motor fuel tax funds is a use for a public purpose, and in fact is a public highway use.

"Upon public hearing and oral argument the protestant now admits that upon a more studied construction of the Act, this provision for the specific use of the stated portion of motor fuel tax does not amount to the creation of any debt against the State, or constitute any illegal use of such tax money. Nevertheless, it is this court's duty to consider and to determine such questions.

"We deem further discussion unnecessary. It is plain from the provisions of the Act, and from what we have said above, that this apportionment of part of the tax from motor fuel consumed on the several turnpikes into a segregated trust fund, and the possible permissive use of such fund, and the possible making of expenditures therefrom does not constitute any illegal use of such tax money, nor does such provision create any debt against the State of Oklahoma. This conclusion seems to us to be in complete harmony with this court's decisions in the several Turnpike cases heretofore decided and cited in an earlier paragraph of this opinion."

And in paragraph three of the syllabus in that case we held as follows:

"The Legislature may apportion a specifically stated part or portion of the tax collected from motor fuel consumed on turnpikes of Oklahoma to a Trust Fund to be used as a guarantee for the payment of interest upon Turnpike Bonds subsequently issued for the construction of additional Turnpikes which are authorized by law, and the provisions in Sections 1, 3 and 4, in the 1959 Turnpike Act, House Bill 932 of the 1959 Legislature, 69 O.S.1959 Supp. Sections 680, 682 and 683 providing therefor are valid."

It seems to me that the above determination in that case in January, 1960, would guide and require us to change the majority opinion in this case as here requested and urged by the Turnpike Authority.

The Turnpike Authority here urges that a full affirmative answer to this third question is legally justified as being well within the legislative power, and I believe it is so, and that the majority opinion should be expanded and liberalized to that extent.

I am authorized to say that BLACKBIRD, V. C. J., and HALLEY and JOHNSON, JJ., concur in these dissenting views.