Application of OKLAHOMA EDUCATION-
AL TELEVISION AUTHORITY.

No. 36411.

Supreme Court of Oklahoma.

July 9, 1954.

Mac Q. Williamson, Atty. Gen., J. Harry Johnson, Asst. Atty. Gen., George J. Fagin, Oklahoma City, for applicant Oklahoma Educational Television Authority.

Walter B. Emery, Oklahoma City, amicus curiae, for Joint Committee on Educational Television.

Horsley, Epton & Culp, Wewoka, amicus curiae, for Oklahoma State Regents for Higher Education.

T. R. Benedum and Maurice H. Merrill, Norman, amici curiae, for University of Oklahoma.

John C. Monk, Stillwater, amicus curiae, for Oklahoma Agricultural & Mechanical College.

WELCH, Justice.

This is an original action in the form of an application for the approval of $1,450,-000 in bonds proposed to be issued by the Oklahoma Educational Television Authority, herein referred to as "Authority," pursuant to the provisions of H.B.No.1033, enacted by the 1953 Legislature, S.L.1953, p. 551, et seq.; 70 Okl.St.Ann. §§ 2141–2165; creating the Oklahoma Educational Television Authority and which enactment will be referred to as the "Act."

By the Act Authority is made " * * * a body corporate and politic * * *," 70 O.S.1953 Supp. § 2145, with the authority to sue and to be sued, and designated an instrumentality of the State for the expressed purpose of making educational television services available to Oklahoma citizens. Authority is authorized " * * * to plan, construct, repair, maintain and operate educational television facilities with channels assigned by the Federal Communications Commission to the State of Oklahoma for educational television purposes. * * * " 70 O.S.1953 Supp. § 2141.

Authority is authorized to receive appropriations from the State Legislature and to accept grants in aid of construction and operation, and "to issue revenue bonds payable solely from dedicated revenues," to meet the costs of the facilities authorized. It is stated in Section 1 of the Act that bonds issued by Authority " * * * shall never become obligations of the State of Oklahoma, but shall be retired by the Authority as provided in this Act * * *," and that neither the faith and credit, nor the taxing power of the State, or any political subdivision thereof, is pledged to the payment of the principal of or the interest on such bonds.

The Act then provides in Section 10 as follows:

"The principal and interest necessary to retire any bonds issued by the Authority shall be paid out of the 'Oklahoma Educational Television Bond Sinking Fund' hereinafter established by Section 11 of this Act." 70 O.S.1953 Supp. § 2150.

The Act then in Section 11 creates the aforesaid sinking fund in the State Treasury and authorizes and directs the State Treasurer to transfer into said sinking fund all revenues accruing to the public Building Fund, to be used solely for the purpose of retiring bonds issued by the Authority.

Section 20 of the Act gives this court exclusive original jurisdiction to pass upon the constitutionality of the Act and authorizes an original action in this court to determine the validity of any proposed bond issue.

It appears that the Authority proposes to issue bonds in the sum of $1,450,000, and has made a tentative agreement for the sale

thereof, and now seeks a decision by this court on the following five points, to-wit:

"(1) That House Bill No. 1033 enacted by the 1953 Legislature is constitutional.

"(2) That the bonds authorized by the said House Bill No. 1033 are not violative of Sections 23, 24 and 25, Article 10 of the State Constitution.

"(3) That all of the revenue accruing to the Public Building Fund is pledged to the payment of said bonds.

"(4) That the revenue pledged for the payment of said bonds cannot be diverted or appropriated to other purposes by future Legislatures as long as there are bonds of the Authority outstanding and unpaid.

"(5) That the bonds of the Authority are issued in accordance with House Bill No. 1033."

We first consider point No. 3, and it appears certain that all of the presently existing revenue and moneys in the Public Building Fund of the State of Oklahoma, together with all revenue accruing therein in future years is pledged to the payment of said bonds. It is provided in the trust agreement for retirement of the bonds as authorized by Section 12 of the Act, that

"The Authority has pledged and assigned and does hereby pledge and assign to the Trustee revenues now in and accruing to the Public Building Fund which shall go into the Oklahoma Educational Television Bond Sinking Fund, and in event of a deficiency therein also net revenues of the Facilities, as security for the payment of the bonds and the interest thereon."

It is further provided in Article IV of the same trust agreement that

"The Authority covenants and agrees that it shall cause (a) the Commissioners of the Land Office and the State Board of Public Affairs to transmit to the State Treasurer daily or in any event not to exceed every thirty days, all funds collected by them which constitute revenues accruing to the Public Building Fund of the State of Oklahoma; (b) the State Treasurer to transfer such revenue of the Public Building Fund to the Oklahoma Educational Television Bond Sinking Fund in the State Treasury; (c) the State Treasurer monthly to transmit all such revenue to the Trustee to be placed by such Trustee in the Bond Fund to meet principal and interest requirements of the bonds, and to call bonds for redemption as herein provided."

It is further provided in Article IV of the trust agreement as follows:

"The Authority covenants and agrees that the revenues accruing to the Public Building Fund as hereinbefore set out and which shall be placed in the Oklahoma Educational Television Bond Sinking Fund in the State Treasury and to be transmitted to the Trustee is pledged and dedicated for the payment of the principal and interest of said bonds. Such Public Building Fund consisting of the following revenue: An Act of Congress approved June 16, 1906, entitled 'An Act to enable the people of Oklahoma and of Indian Territory to form a Constitution and State Government and be admitted into the Union on an equal footing with the original states, etc., certain lands were granted to the State of Oklahoma for charitable, penal, educational and public building purposes; the State of Oklahoma by Section 4, Article XI of its Constitution has accepted the grant thereby made; the State of Oklahoma by acts of its legislature known as Title 64, Oklahoma Statutes 1951, provides for the sale, leasing and rental of such land; Section 371 of said Title 64, Oklahoma Statutes 1951, provides that all moneys heretofore or hereafter received from the sale or rentals of Section 33 and lands granted in lieu thereof, the same being lands granted to the State of Oklahoma for charitable and penal institutions and public buildings shall constitute and be known as the Public Building Fund. Title 74, Oklahoma Statutes 1951, Section 98, provides for the placing of all moneys received from oil, gas and mineral leases on cer-

tain Capitol grounds to the Public Building Fund. Title 64 Oklahoma Statutes 1951, Section 371a, provides for the placing of moneys in the Public Building Fund which formerly went into the University Hospital Oil and Gas Account."

And it is further provided in Article 7 of the trust agreement that in the event of any default the Trustee may enforce compliance with all provisions of the trust agreement by such legal action or suits or special proceedings before courts or boards or any officer having jurisdiction, as the trustee deems effectual to protect or enforce such rights.

It seems this is amply sufficient to say without question that, if it may legally be done, all of the revenue accruing to the Public Building Fund in future years is pledged to the payment of said bonds.

In reference to the fourth point above quoted it seems clear that since this particular revenue is irrevocably pledged for the payment of said bonds, that the same cannot be diverted or appropriated for other purposes by future Legislatures as long as there are bonds of the Authority outstanding and unpaid. If it were otherwise of course the pledge of this revenue to payment of the bonds would be ineffectual.

■ As to point number five quoted above, we need not go into detail since it is quite apparent that the bonds in question are issued in accordance with the provisions of the Act.

We now come to points number one and two quoted above, which in our view are the decisive points. In final analysis the controlling question is whether the bonds authorized by the Act are violative of Section 23, Art. 10 of the Constitution of Oklahoma.

That section, by the 1941 amendment, reads in material part as follows:

"The State shall never create or authorize the creation of any debt or obligation * * * against the State, or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid * * *."

Following the above partial quotation there are two exceptions, but they are both entirely foreign to the matters here under consideration, therefore we do not either quote or discuss these exceptions, other than to stay that they relate to debts created by affirmative vote of the people and to debts necessary to repel invasion.

This bond issue of course creates a debt against the Public Building Fund of the State in that it pledges existing and future revenues of the fund to the payment of these bonds. It is equally plain that by this Act the State attempts to "authorize the creation" of this debt. We come then to the question whether this is a debt "against the state, or any department, institution or agency thereof." The Public Building Fund of the State has existed as an agency or institution of the State since Statehood. In fact it was tentatively created prior to Statehood when the Federal Government by Act of Congress approved June 16, 1906, granted or offered to grant to the new state certain lands which together with revenue therefrom should constitute such fund of the state for certain purposes. Since that time the state has channeled other property and moneys or income into such fund, that is, into the Public Building Fund of Oklahoma.

The language of the Constitution above quoted, Section 23 of Art. 10 would seem to be all inclusive so as to refer to and include any and all funds which are permanently held for and belong to the state for its use in behalf of the citizens of the state, whether such funds are for general use by the state or for some special or restricted purpose use as is true in the case of Public Building Fund. These special uses are referred to in the Enabling Act adopted by the National Congress and in the Constitution and Statutes of the State.

■ Authority here contends that by law the Legislature is authorized to use or handle or make expenditures from the Public Building Fund in its discretion, and cites authority for such contention. By virtue of this power the Legislature may at any time expend any and all moneys of such fund as it sees fit, within the purpose of expenditures for which this fund is reserved, and perhaps the Legislature could

expend any such funds on hand for the uses and purposes of Authority. However, there is nothing in these cited rules specifically dealing with the power of the Legislature to create a debt against the Public Building Fund or against the future revenues thereof.

Authority cites the rule that in the early days of Statehood, and prior to 1941, the Legislature had power to authorize and did authorize the creation of debts against this fund. We observe that rule and that the same was upheld by this court, but that was prior to the adoption of the constitutional provisions above quoted, Section 23, Art. 10, and we observe that prior to the 1941 amendment there was no provision of the Constitution stating any bar against the creation of any such debt. For the purpose of this decision it may be fully assumed that prior to 1941, and in the absence of the quoted constitutional provision, by amendment, the Legislature did have and would have complete authority to create or authorize the creation of this specific debt against that fund. However, that does not argue that such authority would exist after the 1941 amendment to the Constitution which in such plain terms prohibits the creation of *"any debt * * * against the State, or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid * * *."* (Emphasis added.)

The Authority cites cases involving self-liquidating bond issues, that is, bond issues to provide funds for the construction of facilities which facilities would produce funds from the operation thereof, which funds only were to be used or to go to pay off the bonded debt. Baker v. Carter, 1933, 165 Okl. 116, 25 P.2d 747, A. & M. Dormitory Construction Bonds; Sheldon v. Grand River Dam Authority, 1938, 182 Okl. 24, 76 P.2d 355, construction bonds for dam, hydro-electric plant, etc.; State ex rel. Kerr v. Grand River Dam Authority, 1945, 195 Okl. 8, 154 P.2d 946, second or additional bond issue for Grand River Dam; Application of Board of Regents University of Oklahoma, 1945, 195 Okl. 641, 161 P.2d 447, Dormitory Construction Bonds; Application of Board of Regents for Okla-

homa Agricultural and Mechanical Colleges, 1946, 196 Okl. 622, 167 P.2d 883, Dormitory Construction Bonds; Application of Oklahoma Planning and Resources Board, 1949, 201 Okl. 178, 203 P.2d 415, Bonds to construct Park Facilities and Housing space to be rented; Application of Oklahoma Turnpike Authority, 1950, 203 Okl. 335, 221 P.2d 795, Bonds to Construct Toll Road.

■ Authority points out that in those cases this court held that such transactions did not constitute the authorization or creation of a debt against the state, or any department, institution or agency thereof, as is prohibited by the 1941 amendment. We observe these authorities and adhere to that rule as therein applied. Those bond issues or debts were not created against existing permanent funds of the state, for regularly recurring use in the interest of the citizens of the state. The money realized by each of those bond issues itself created the construction or facility which in turn produced the income and funds against which the debt was a standing obligation, and the debt specifically could not be collected from any other source, nor paid with any other moneys. But for the creation or construction of the facilities in those cases, the funds against which those debts stood would never have existed. But here we have the creation of a debt against a fund which has always existed as a valuable asset and fund of the state. This fund is not created by the facility here to be constructed, or operated, nor does this facility nor this Authority add anything at all to this permanent fund of the state. If the bonds in this case were to be paid exclusively from revenue earned or received by the facility in the operation authorized by this Act, then the last cited authorities would be in point, and in keeping with such rule the transaction would not create a debt in violation of the quoted section of the Constitution. In fact the Act in Section 13 authorizes the Authority to fix, charge and collect fees for the use of any of its facilities, thus contemplating that Authority might have income and some earned net revenue. Under the self-liquidating debt rule of the above cited cases, it

would follow that a debt exclusively against such income or revenue would not violate Section 23 of Art. 10, Constitution, as amended in 1941.

It seems rather plain however that in adopting the constitutional amendment the people intended to prohibit the creation of debts except in cases coming within the stated exceptions of the Constitution (it is not contended that the debt here involved comes within any of such stated exceptions).

In Black on Interpretation of Laws, in the Chapter on Construction of Constitutions, the following statements occur on pages 27 and 28:

"The provisions of a constitution are almost invariably mandatory; it is only in extremely plain cases, or under the pressure of necessity, that they can be construed as merely directory.

"It is not lightly to be presumed that any provision deemed essential to be incorporated in an instrument so solemn and enduring as a constitution, was designed to be merely in the nature of a direction, without imperative force. 'It would, in a general sense, be a dangerous doctrine to announce that any of the provisions of the constitution may be obeyed or disregarded at the mere will or pleasure of the legislature, unless it is clear beyond all question that such was the intention of the framers of that instrument. It would seem to be a lowering of the proper dignity of the fundamental law to say that it descends to prescribing rules or order in unessential matters which may be followed or disregarded at pleasure.' As a rule, therefore, whenever the language used in a constitution is prohibitory, it is to be understood as intended to be a positive and unequivocal negation; * * *"

And in the same Chapter on page 33 it is stated:

"It is a general rule that the words of a constitution are to be understood in the sense in which they are popularly employed, unless the context or the very nature of the subject indicates otherwise. Every word employed in the constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it. Constitutions are not designed for metaphysical or logical subtilties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss. * * *"

This court has followed these general rules and we know of no case in which this court has departed therefrom. In Texas Co. v. State ex rel. Coryell, County Attorney, 198 Okl. 565, 180 P.2d 631, 634, this court in discussion of constitutional construction said:

"The intention to be ascertained is that of the people. The rule of construction is common understanding. * * *"

Later in that opinion it is stated:

" 'Courts in construing unambiguous Constitutional provisions, are not at liberty to search for meaning beyond the instrument * * * Meaning of Constitution, apparent on face, must be accepted.' Shaw v. Grumbine, 137 Okl. 95, 278 P. 311; State ex rel. Edwards v. Millar, 21 Okl. 448, 96 P. 747."

In behalf of Authority it is pointed out that in each of the seven former decisions last above cited it was held or stated in effect that the debt provisions of the Constitution, Section 23 of Art. 10 applied only to debts for the payment of which resort might be had to the State's tax money, or to the taxing power of the State, or to money collected into the state's funds by taxation. We do observe that such lan-

guage is used in both the syllabus and the body of the opinions in those cases. However, in each and every instance those expressions were not necessary in deciding the case. We actually decided in each case that the bond debt was a "self-liquidating" debt against a specially created fund and therefore not such a debt as was prohibited, and that was all that we needed to decide in each of those cases. We did use that language referred to in two cases before the 1941 Constitutional amendment, and then we continued it in five cases after the 1941 amendment. Whatever its applicability before 1941, it surely was not applicable after the amendment in 1941. To urge applicability of that language after the 1941 amendment is to urge that the amendment affords protection from future debt against a state fund fed by tax receipts, but does not afford equal protection to a state fund fed by land sales, land rentals, oil receipts, etc., as is the permanent State Building Fund. We see no logic in that. The Public Building Fund of the state is a permanent fund of the state and it and its proceeds are used for the general benefit of the citizens of the state, within the limitations specially provided for the use of this fund. If that fund and its proceeds did not exist and therefore was not available for use in behalf of the citizenship of the state, then the state could not have those things now purchased with that fund and its proceeds without using tax money of the state for such purpose. Therefore, while the Public Building Fund is not itself a tax revenue fund of the State, it serves purposes which if they were not served out of that fund, they must necessarily be served out of tax money, or the State must go without them. Therefore there is no fair analogy between this permanent fund of the State and the special revenue funds or self-liquidating debts involved in each of the foregoing seven cases. In each of those cases the special fund was not theretofore in existence, and it came into existence only by the receiving or collecting of revenues from the facilities constructed by the bond issue proceeds in each case. All we needed to decide in either of those cases was that it was a self-liquidating debt to be paid out of a special fund to come into existence in the future from revenue received from the facility to be constructed by the bond issue. Therefore, all that we said in those cases about section 23 as amended having application only to tax proceeds or only to debts which might look to the taxing power for payment was not necessary to the decision. That was or may have been an important part of the decisions prior to March 11, 1941, when the amended section 23 was adopted. Thereafter, however, we should not have continued the use of that language and insofar as that language in any of those cases is sought to be applied to this case, all such language should be disapproved.

The distinction between this case and those above cited is readily apparent. Those bond issues and those debts in those seven cases were fully and exclusively "self-liquidating." Here the proposed bonded debt is not at all self-liquidating. It is made quite apparent that the revenue from this facility, if there is any revenue, is to be used and expended in operating the facility itself. The bonded debt is clearly made a debt against an existing permanent fund of the state and its future revenues. There is provision for secondary liability of the operating revenue of the facility to payment of these bonds. That is, it is provided that if the Public Building Fund or the revenues accruing to the Public Building Fund in the future are not sufficient to retire these bonds with interest, that then, and in that event, resort may be had to any existing fund created by revenues received from operation of the facility. That is wholly different from any of the special revenue bonds or the self-liquidating debts involved in the seven cases heretofore cited. This being a debt against an existing permanent fund of the state which regularly produces revenue, it is difficult to see how it could be argued that this is not a debt against an existing Agency or Institution of the State.

Why would this provision of the Constitution operate to protect from future debt the cigarette tax fund or the gasoline tax fund and not also operate to protect from future debt the Public Building Fund?

Why would there be any such intention? A dollar in one such fund is worth as much to the citizens of the state as a dollar in the other fund. A dollar in one fund is as much the property of and is as much owned by the citizens of the State as a dollar in the other fund. We recognize of course the difference that would be present if the law in question and the bond issue in question, and the facility involved did itself create a special and additional fund as was true in all of the self-liquidating debt cases above cited. We must conclude that in sound reasoning the amended Section 23 of Art. 10 should protect one permanent fund as well as another permanent fund, and we must conclude from the language used that this amended Section 23 does protect all other permanent funds of the State as well as those funds which are fed directly by taxes.

When a dollar comes into the possession and ownership of the State, it is of no more or less value to the State and the citizens thereof because it came from cigarette tax or gasoline tax or from rent on land owned by the State, or from the sale of land owned by the State, or from oil royalties channeled into the Public Building Fund by the Legislature. There is no reason why the people in adopting the amended Section 23 should have desired to give more or less protection from future debt to either dollar, or to either fund which presently and permanently existed and belonged to the State. We consider it beyond question that the State and the people of the State have the power by constitutional provision to protect all funds belonging to the State from future debt. We must conclude that this was the purpose of the amended Section 23, and that such purpose was fully accomplished thereby.

Worthy of note here is our former decision in Boswell v. State, 181 Okl. 435, 74 P.2d 940, 943. The conclusion there reached bears some analogy to our conclusion here. There even before the 1941 amendment to Section 23 of Art. 10, it was held, though with some dissenting views, that the State could not constitutionally authorize the State Highway Commission to issue and sell highway revenue anticipating notes to be paid out of a fund to be fed by certain existing taxes on gasoline and license taxes, though without increasing any taxes. Such a transaction was held to be in violation of the old provisions of Section 23, Art. 10. There as to the meaning of the word "debt" we observe this in the body of the opinion.

"If we are to give the words used their natural and ordinary meaning, we refer to Webster's New International Dictionary, where 'debt' is defined as: 'That which is due from one person to another, whether money, goods, or services; that which one person is bound to pay to another, or to perform for his benefit; thing owed; obligation; liability.' Therefore, if we give the word 'debt' its plain and ordinary meaning, we believe no one can doubt that the act in question authorizes the creation of a state debt. The bill provides for the issuance of notes, and it is common knowledge that a note is the evidence of a debt. As ordinarily understood, it is given for no other purpose. The notes bear interest. They mature at definite dates. They are promises to pay money. These are the attributes of debt.

"We must, therefore, inevitably conclude that a 'debt' within the prohibition of the above-quoted constitutional provisions will be incurred under this act unless for some well-defined reason said constitutional provisions are otherwise inapplicable.

"It is insisted by defendants that these constitutional provisions apply only to a debt where a direct property tax is levied for its payment, and that they do not apply where the full faith and credit of the state is not pledged, and that in said act it is provided that only a portion of the excise tax on gasoline and certain license taxes are pledged and paid into a special liquidating fund, and therefore the debt limitation provisions of the Constitution are not violated."

Nevertheless, this court held that transaction to be a debt within the Constitutional provision. There also the court recog-

nized the difference as to "self-liquidating" special fund cases.

■ It seems clear to us that this debt as proposed to be created by this bond issue is violative of Section 23, Art. 10 of the Oklahoma Constitution as amended in 1941.

Therefore for the reasons stated, the application of Authority for the approval of these bonds in the sum of $1,450,000 is denied.

■ By reason of the severability clause in Section 25 of theAct, all other provisions of the Act are not affected or impaired by this decision.

JOHNSON, V. C. J., and DAVISON, ARNOLD, O'NEAL, WILLIAMS and BLACKBIRD, JJ., concur.

CORN, J., concurs in result.

HALLEY, C. J., dissents.

Supplemental Opinion on Petition for Rehearing

PER CURIAM.

■ It was not intended by the majority opinion to restrict the Authority from issuing bonds payable from funds now on hand, or accruing, in the Public Building Fund during the biennium ending June 30, 1955.

HALLEY, C. J., JOHNSON, V. C. J., and DAVISON, ARNOLD, WILLIAMS and BLACKBIRD, JJ., concur.

WELCH and O'NEAL, JJ., dissent.

WELCH, Justice (dissenting).

I respectfully dissent to the Supplemental Opinion on Rehearing. I think it presents or refers to a new and different issue from any issue presented in the original application for approval of a proposed bond issue in the sum of $1,450,000, to be retired as set out in the majority opinion.

I think we have no jurisdiction in this proceeding except to approve or disapprove the proposed bond issue of $1,450,000. It seems to me that our jurisdiction is so lim-

ited by Section 20 of the Act which provides as follows:

"The Authority is authorized in its discretion to file an application with the Supreme Court of Oklahoma for the approval of any bonds to be issued thereunder, and exclusive original jurisdiction is hereby conferred upon the Supreme Court to hear and determine each such application. It shall be the duty of the court to give such applications precedence over the other business of the court and to consider and pass upon the applications and any protests which may be filed thereto as speedily as possible. Notice of the hearing on each application shall be given by a notice published in a newspaper of general circulation in the State that on a day named the Authority will ask the Court to hear its application and approve the bonds. Such notice shall inform all persons interested that they may file protests against the issuance of the bonds and be present at the hearing and contest the legality thereof. Such notice shall be published one (1) time not less than ten (10) days prior to the date named for the hearing and the hearing may be adjourned from time to time in the discretion of the Court. If the Court shall be satisfied that the bonds have been properly authorized in accordance with this Act and that when issued, they will constitute valid obligations in accordance with their terms, the Court shall render its written opinion approving the bonds and shall fix the time within which a petition for rehearing may be filed. The decision of the Court shall be a judicial determination of the validity of the bonds, shall be conclusive as to the Authority, its officers and agents, and thereafter the bonds so approved and the revenues pledged to their payment shall be incontestable in any court in the State of Oklahoma." 70 O.S.1953 Supp. § 2160.

This issue was in no way presented in the application filed March 25th, 1954, nor in any way mentioned in the notice issued March 25, 1954.

If the Authority desires to ask the court to approve its power to issue bonds in any different sum payable only from the Public Building Fund moneys now on hand or collected into such fund prior to June 30th, 1955, we should have such application formally before us, stating the amount and details of such bond issue; otherwise I think we should not adopt this supplemental opinion deciding or referring to that which I deem to be a new issue from the issues which were before us when we adopted the majority opinion.

If the Authority does not desire, in its discretion, to ask the court to approve or pass upon such other and different bond issue from its pending formal application, and upon which we gave notice, then I think it improper by supplemental opinion to make any reference to the power or authority in reference to any such other bond issue.