Application of OKLAHOMA TURNPIKE AUTHORITY for the Approval of $56,-500,000 Turnpike Revenue Bonds for the Southwestern Project.

No. 39733.

Supreme Court of Oklahoma.

Sept. 21, 1961.

Rehearing Denied Oct. 3, 1961.

Looney, Watts, Looney, Nichols & Johnson, Reynolds & Ridings, and R. L. Vaughan, Oklahoma City, for Oklahoma Turnpike Authority.

Norman & Wheeler, Chester Norman, Chal Wheeler and Andrew C. Wilcoxen, Muskogee, for protestants John Russell and Bill Harrower.

Charles R. Nesbitt, Oklahoma City, James C. Hamill, Oklahoma City, of counsel, for protestant Bill Hoover.

B. H. Carey, Oklahoma City, for protestants R. C. Cates, E. N. Potts, G. R. Sharpe and Floyd Stine.

WILLIAMS, Chief Justice.

In this original action, the Oklahoma Turnpike Authority hereinafter referred to as applicant, or Authority, seeks approval of the issuance of turnpike revenue bonds.

Prior to the filing of this action applicant passed a resolution "repealing certain resolutions relative to the southwestern and Eastern turnpikes and the authorization of bonds therefor adopted by the applicant on September 30, 1960."

Applicant has by resolution provided for a bond issue in the amount of $56,500,000 for the construction of the proposed southwestern turnpike project.

Due notice of the hearing of this application was given. Protests to the approval of the application were filed. The court, as directed by House Bill 932 of the 27th Oklahoma Legislature, has granted the application precedence over other matters before the court. The applicant and protestants were heard in oral argument and written briefs have been submitted. The application shows the form of the bonds and trust agreement incident thereto. The bonds recite on their face that they do not create any debt against the State of Oklahoma.

The Legislature, under authority of Article 7, Sec. 2 of the Constitution of Oklahoma, in 69 O.S.1959 Supp. 668, conferred jurisdiction on this court to hear and determine this application.

In Application of Oklahoma Turnpike Authority, Okl., 348 P.2d 510, we held the Oklahoma Turnpike Act of 1959, 69 O.S. Supp. §§ 680-683, was not unconstitutional as to any of the points presented in that case. That case, in part, related to the proposed (southwestern) turnpike involved in this case.

Thereafter applicant filed an application for the approval of the issuance of turnpike revenue bonds of the turnpike authority for project on the southwestern route and the eastern route. In Okl., 359 P.2d 680, 683, we approved the bonds "when issued in accordance with the law expressed in" that opinion.

The first issue involved in this action as set forth by applicant is:

"Under the Constitution of the State of Oklahoma, the Enabling Act and other applicable law are the $56,500,-000 turnpike revenue bonds (Southwestern Turnpike Project), when issued, valid and are the official actions and proceedings of the authority respecting the authorization and the approval of the location, construction and financing of the Southwestern Turnpike Project, the authorization and issuance of said $56,500,000 Bonds and the authorization of such other bonds as may be issued pursuant to said trust agreement securing such bonds, and the provisions of the trust agreement, valid and in conformity with law?"

The description and location of the southwestern project as stated in the report of the engineers, trust agreement and bond resolution conform to the location and description therefor set forth in Section 655 (e) (2) of 69 O.S.1959 Supp., and as considered in 359 P.2d 680. The trust agreement attached to the application now before us is substantially similar to the trust agreement provided for in such Enabling Act and approved by this court in 359 P.2d 680. Substantial differences in the two agreements are the dropping of authorization for eastern turnpike bonds, reduction in the amount of the southwestern bonds, certain date changes required as a result of this application being filed approximately a year later than the one treated in 359 P.2d 680 and provisions resulting from the passage of Senate Bill 432 of the Twenty-Eighth Oklahoma Legislature.

The actions and proceedings of applicant are in line with those of the Authority approved by this court in 359 P.2d 680.

In 359 P.2d 680, 684, this court said:

"For ease of reference the terms 'Enabling Act', 'Southwestern Turnpike Project', 'Eastern Turnpike Project', 'Southwestern Route', 'Eastern Route', 'Bonds', 'Turnpike Revenue Bonds', 'Sinking Fund', 'Trust Fund' and 'Trust Agreement' in this opinion are intended to have the same meaning as the same terms, respectively, have in the Application briefs and Trust Agreement of the Authority."

In 348 P.2d 510, 512, this Court said (syllabus paragraphs 1, 2 and 6):

"By virtue of the provisions of Art. 7, Sec. 2 of the Constitution the Legislature may confer upon the Supreme Court original jurisdiction to hear a specified application by the Oklahoma Turnpike Authority.

"Upon proper application of the Oklahoma Turnpike Authority and after requiring due notice fixing a protest period and a date for hearing, and after conducting a hearing on such application and any protest, it is the authority and duty of this court to answer such specific questions as are presented.

"The Oklahoma Turnpike Authority is fully authorized to construct a turnpike between and connecting with the Turner Turnpike near the Oklahoma City terminus, and Wichita Falls, Texas, and in connection therewith may enter into an agreement with the Oklahoma Department of Highways for the construction by the Department of Highways of a four lane, divided, toll-free bridge on a United States or

State Highway across the South Canadian River south or west of Will Rogers Airport and west of the north-south line of May Avenue, with ¼th of the cost of said bridge and the approaches thereto to be paid by the Oklahoma Turnpike Authority, and the remaining ¾ths to be paid from State and Federal-Aid Funds."

In 359 P.2d 680, this Court further said (syllabus paragraph 1):

"The official actions and proceedings of the Oklahoma Turnpike Authority respecting the authorization and the approval of the location, construction and financing of the Southwestern Turnpike Project and the Eastern Turnpike Project, and the authorization and issuance of the Bonds and the authorization and delivery of the Trust Agreement and the provisions of the Trust Agreement, are valid and in conformity with the Enabling Act and other applicable law."

The portions of our opinions in Application of Oklahoma Turnpike Authority, 348 P.2d 510, and Application of Oklahoma Turnpike Authority, 359 P.2d 630, hereinabove and hereinafter quoted as well as portions of others of our decisions herein quoted are adopted, in so far as applicable, as the law, in part, of this case.

We hereby accept jurisdiction of this proceeding and proceed to the determination of the issues involved herein.

■ We find that the official actions and proceedings of the Authority respecting the authorization and the approval of the location, construction and financing of the specified southwestern turnpike project and the authorization for issuance of the bonds and the authorization for execution and delivery of the trust agreement, and the provisions of the trust agreement are valid and in conformity with the Enabling Act and other applicable law.

Upon the basis of the discussion hereinabove appearing and that which follows hereinafter we determine that, under the Constitution of the State of Oklahoma, the

Enabling Act and other applicable law the $56,500,000 turnpike revenue bonds (southwestern turnpike project) when issued in accordance with the law as expressed in this opinion, will be valid.

The second issue presented by applicant is:

"Under the Constitution of the State of Oklahoma, the enabling act and other applicable law will the holders of the bonds issued and secured under the trust agreement have an accrued and vested contract right not only in and to an exclusive pledge by the authority under the trust agreement of deposits accumulated in the trust fund but also in and to the continued apportionment to the Authority, each calendar month, until all of the bonded indebtedness including the interest thereon for the Turner Section of the Oklahoma Turnpikes is paid in full, of ninety-seven per cent of an amount equal to the motor fuel excise taxes computed on 97½% of the total gallonage of all fuels consumed, during the calendar month during which the tax being apportioned accrued, on all Oklahoma Turnpike Projects and to the continued deposit in the trust fund of the full amount of each such apportionment; provided that no such pledge or vesting of said contract right shall be deemed to restrict in any way the State's power to change the rate of the motor fuel tax levy or to repeal said levy?"

Senate Bill 432 of the 28th Oklahoma Legislature became effective July 26, 1961. Such bill amended sections 680 and 683 of 69 O.S.1959 Supp.

Section 680 now provides, in part, that:

"(a) Beginning with the first apportionment of motor fuel taxes made after the * * * *effective date* of this act, and until * * * *all presently outstanding bonds and the interest thereon for the Turner section of the Oklahoma Turnpikes are paid in full,* the Oklahoma Tax Commission shall

each month determine an amount equal to the motor fuel excise taxes computed on ninety-seven and one-half percent (97½%) of the total gallonage of all fuels consumed, during the calendar month in which the tax being apportioned accrued, on all Oklahoma Turnpike projects and apportion a sum equal to said amount from all gasoline tax collections as follows: * * *."

Section 683, as amended, reads in part as follows:

"*Motor fuel taxes on fuels consumed on Oklahoma Turnpikes and apportioned to the Oklahoma Turnpike Authority are declared to be revenues of the Oklahoma Turnpikes, since they are derived directly from the operation of such turnpikes, and are subject to pledge by the Oklahoma Turnpike Authority in the same manner as tolls and other revenues of said turnpikes may be pledged, as security for turnpike revenue bonds hereafter issued.* The Oklahoma Turnpike Authority shall segregate and hold such motor fuel excise taxes apportioned to it * * * *and all funds heretofore or hereafter accumulated in the Trust Fund* in trust for the uses and purposes herein provided.

"The deposits in this Trust Fund * * * may be expended or pledged by the Oklahoma Turnpike Authority, as it may deem proper, either in whole or in part, for making up any deficiency in the moneys available to meet interest requirements on turnpike bonds hereafter issued *and for such purpose it may vest in the holders of any such bonds a contract right to the continuance of those apportionments to the Oklahoma Turnpike Authority provided in § 680 hereof but subject to the limitations therein (provided, that no such pledge or vesting of said contract right shall be deemed to restrict in any way the state's power to change the rate of the motor fuel tax levy or to repeal said levy)* and for the payment of necessary expenses in the financing of ad-

ditional turnpikes, provided, that such expenses of financing shall not exceed on the Southwest Turnpike the sum of Twenty-five Thousand Dollars ($25,-000.00) or on the Eastern Turnpike the sum of Fifty Thousand Dollars ($50,-000.00), not more than ten percent (10%) of which sums shall be used as attorneys' fees, and provided, that any funds expended as permitted herein shall, upon payment of all interest and principal of all bonds issued hereunder, and before delivery of any said Turnpike to the State of Oklahoma Department of Highways, be replaced in said trust fund by said authority, and upon the completion of said reimbursement, said trust shall terminate and the balance in said Trust Fund shall be delivered to the State of Oklahoma Department of Highways. * * *"

■ In 348 P.2d 510, 512, we held in paragraphs 3 and 4 of the syllabus as follows:

"The Legislature may apportion a specifically stated part or portion of the tax collected from motor fuel consumed on turnpikes of Oklahoma to a Trust Fund to be used as a guarantee for the payment of interest upon Turnpike Bonds subsequently issued for the construction of additional Turnpikes which are authorized by law, and the provisions in Sections 1, 3 and 4, in the 1959 Turnpike Act, House Bill 932 of the 1959 Legislature, 69 O.S.1959 Supp. Sections 680, 682 and 683 providing therefor are valid.

"The Oklahoma Turnpike Authority may expend or pledge money from the Trust Fund mentioned in the preceding paragraph as money accumulates therein, for the purpose of making up any deficiencies in the moneys available to meet any interest requirements on Turnpike Bonds subsequently issued, and for the payment of certain expenses in financing additional turnpikes within the limitations provided by subdivisions (a) and (b) of Section 4 of

the 1959 Turnpike Act, H. B. 932 of the 1959 Legislature, 69 O.S.Supp.1959, Sec. 683."

In 359 P.2d 680, 681, we stated in paragraphs 2 and 3 as follows:

"The holders of outstanding bonds issued to construct these two Turnpikes or either of them have an accrued and vested right to an exclusive pledge by the Authority under the Trust Agreement to deposits accumulated in the Trust Fund for making up any deficiency in moneys available to meet interest requirements as provided in 69 O.S. Supp.1959, Sec. 683, and for the payment of interest on the bonds during the period of construction as specified in the Trust Agreement.

"While the holders of outstanding bonds issued to build these two Turnpike Projects or either of them have an accrued and vested right to an exclusive pledge by the Authority, of deposits which have accumulated in the past or which will accumulate in the future in the segregated Trust Fund pursuant to 69 O.S.Supp.1959, Secs. 680 and 683(a) and (b), they will not have an accrued and vested contract right in and to the continued apportionment to the Authority by the State of Oklahoma each calendar month of 97% of an amount equal to the motor fuel excise taxes collected on motor fuel consumed on all Oklahoma Turnpike projects according to the provisions and limitations of the Act, and will have no vested contract rights which would preclude the Legislature from repealing, reducing or otherwise changing the levy or rate of levy of such tax."

In the body of the opinion at 359 P.2d 680, 689, is the following language:

"Thus by present laws the motor fuel tax is established and definite and so is the apportionment of the proceeds thereof, including the apportionment of this portion to Authority, and under existing laws it is contemplated that there will continue to be a motor fuel tax with apportionment of the proceeds or collections thereof as now provided.

"However, there is nothing in the law 69 O.S.Supp.1959 § 683(a) and (b) to guarantee that the future Legislatures must maintain the same motor fuel tax or the same apportionment of the proceeds or of the collections thereof.

"It therefore becomes apparent that the Turnpike Authority is inviting this court to make guarantees that are not made by the legislation under consideration. Having concluded that the Legislature has not given the bondholders a vested right in, or a guarantee, that future Legislatures must maintain the same motor fuel tax or the same apportionment of the proceeds it follows that we must, and do, hold that the bondholders will not have an accrued or vested contract right in and to the maintenance of the same motor fuel tax or the same apportionment thereof."

It would seem that the 28th Legislature of Oklahoma intended by the passage of Senate Bill 432 to make such guarantees, subject to the state's power to change the rate of the motor fuel tax levy or to repeal said levy. It is for this court to now determine the constitutionality of such Senate Bill.

The Oklahoma Legislature by the enactment of Senate Bill 432 declared the motor fuel taxes directed to be apportioned to applicant to be revenues of turnpikes. When one travels upon a turnpike in this state, his automobile consumes gasoline upon which, presumptively, he has paid a tax. It is the travelling upon the turnpike that requires the purchase of fuel which results in the payment of the motor fuel tax. Without the turnpike there would not have been the travelling and resulting tax. The turnpikes provide the means for the consumption of the fuel on which the tax is paid. If there is no vehicular travel on the turnpikes, no revenue is apportioned to applicant. The turnpikes must generate or produce traffic to receive revenue.

Protestants argue that up to one-third of the total miles travelled on turnpikes will be on gasoline upon which no Oklahoma tax is paid because such motorists will have purchased gasoline in Missouri or Texas before moving to one of the Oklahoma turnpikes. They argue that it is not accurate to apportion to the Authority taxes based on total miles of turnpike travelled. We do not agree. Before the average motorist could travel across this state he would have to refuel, thereby replacing the gasoline consumed on a turnpike and, no doubt, would leave the state with gasoline in his tank purchased in this state.

Protestant argues that if the turnpike had not been available, the travellers would have used state highways. No doubt that would be true with some, but reason dictates that many travellers come through this state because of the turnpikes and purchase much more gasoline here than they consume on the turnpikes. The taxes on such excess gallons of fuel could well offset the tax apportioned to the applicant, and make up to the State Highway Department any losses of fuel taxes for those vehicles which would have travelled state highways if the turnpikes had not been available.

In Turnpike Authority of Kentucky v. Wall et al., Ky., 336 S.W.2d 551, 557, the court said:

"* * * However, the relationship between a turnpike facility, the gasoline measurably used on it, and the tax on the gasoline so measured is sufficiently direct and apparent to support the concept that such portion of the gasoline tax may be treated as a revenue of the project, * * *."

Protestants argue that:

"An irrevocable pledge of gasoline taxes effective beyond the current biennium is unconstitutional, in that it contravenes Article 10, Sec. 23 of the Oklahoma Constitution, prohibiting future state debt."

Protestants rely on Boswell v. State, 181 Okl. 435, 74 P.2d 940. We do not consider that case in point. Therein all motor fuel taxes regardless of their source were authorized as security for the proposed bonds. Such bonds in the Boswell case were to be used to construct roads on the state highway system, not on self-liquidating projects. The statute in the Boswell case purported to deprive future legislatures of their right to repeal the law levying the tax pledged. In the matter now before us any future legislature may repeal, or raise or lower the motor fuel tax.

In Application of Board of Regents for Oklahoma Agricultural and Mechanical Colleges, 196 Okl. 622, 167 P.2d 883, we said:

"The inhibition of the amendment to section 23, article 10, of the Constitution of the State of Oklahoma (adopted at special election held on March 11, 1941), against the state authorizing any agency of the state to create any debt or obligation or fund or pay any deficit applies solely to such debt, obligation, or deficit for the payment of which resort, but for such amendment, might properly be had to the taxing power of the state."

In Application of Oklahoma Educational Television Authority, Okl., 272 P.2d 1027, 1034, we said:

"We recognize of course the difference that would be present if the law in question and the bond issue in question, and the facility involved did itself create a special and additional fund as was true in all of the self-liquidating debt cases above cited."

In this case the court further said:

"This fund is not created by the facility here to be constructed, or operated, nor does this facility nor this Authority add anything at all to this permanent fund of the state. If the bonds in this case were to be paid exclusively from revenue earned or received by the facility in the operation authorized by this Act, then the last cited authorities would be in point, and in keeping with such rule the transaction would not create a debt in viola-

tion of the quoted section of the constitution."

The turnpikes have generated or increased vehicular traffic resulting in increased motor fuel taxes. The great part of said increase has been declared by the legislature to be revenue of the turnpikes, and has been by enactment set aside in a special fund for the turnpikes.

A debt against the State of Oklahoma in violation of the Constitution of Oklahoma has not been created or made possible by the passage of Senate Bill 432 of the 28th Oklahoma Legislature.

Protestants argue that:

"A future pledge of gasoline taxes to pay interest on turnpike bonds would constitute a loan of state credit, prohibited by Article 10, Section 15 of the Constitution, and the improper use of public funds, prohibited by Article 10, Sections 14 and 19."

Art. 10, Sec. 14 of the Oklahoma Constitution provides that taxes shall be levied and collected "for public purposes only." Article 10, Sec. 19 of Oklahoma Constitution provides that "no tax levied and collected for one purpose shall ever be devoted to another purpose."

In Application of Oklahoma Turnpike Authority, Okl., 359 P.2d 680, 688, we said:

"Turnpikes have been held to be public highways. Application of Oklahoma Turnpike Authority, 203 Okl. 335, 221 P.2d 795. The above use of the stated portion of motor fuel tax funds is therefore used for public highway construction, and in fact is a use for public highway purpose."

Protestants argue that "motor fuel taxes are collected to be used for 'construction, repair and maintenance of state highways', 68 O.S. (1951) Sec. 659b. All these gasoline taxes apportioned to the Turnpike Authority will be used exclusively to pay interest only on bonds, 69 O.S. (1961) Sec. 683(b). No part of the tax revenue will go to pay the principal on the bonds, which represents (in part) the actual construction cost."

They indicate that if the money were to go for payment of principal, such payment would be lawful. We think that the principal and interest of the bonds cannot be so separated. Without interest the bonds would not have been sold and there would be no principal obligation. It is an economic fact that principal and interest necessarily go together. The funds received from sale of the bonds are to be used to construct the turnpike. Payment of interest thereon is a necessary, included, integral part of the expense of construction, maintenance and operation of the turnpike in question.

Article X, Section 15, of our Constitution provides:

"The credit of the State shall not be given, pledged, or loaned to any individaul, company, corporation, or association, municipality, or political subdivision of the State; nor shall the State become an owner or stockholder in, nor make donation by gift, subscription to stock, by tax, or otherwise, to any company, association, or corporation."

The apportionment of gasoline taxes to the trust fund here involved is neither a loan of state credit nor a gift. In the first place, the bonds are to be paid from the revenues to be produced by the facility. The gasoline taxes apportioned to the Authority are revenues earned by it, paid by users of the turnpikes for the use thereof. They are such revenues by enactment of law and in fact. They, then, are not a gift from any one to any one else.

Moreover, the state's credit is specifically not pledged to the re-payment of such bonds.

Finally, as specifically provided in Senate Bill 432, the state's power to change the rate or repeal the levy is preserved.

Neither the Authority nor purchasers of the bonds will receive a gift or the granting of state credit by the vesting in the bondholders of a contract right to the continued apportionment of fuel taxes so as to violate Article X, Section 15, Constitution.

■ In considering protestants' various contentions herein of unconstitutionali-

ty of the enactments, proceedings and bonds with which we are here concerned, we are mindful of language we employed in the case of Gates v. Easter, Okl., 354 P.2d 438, 441, as follows:

"The basis of plaintiff's contention is that the act is unconstitutional. In determining this issue we must be cognizant of well-established principles of law that 'this court would indulge every possible presumption that an act of the Legislature was constitutional'; and, an 'act will be declared constitutional unless it can be clearly demonstrated that the legislature did not have the power or authority exercised or that its authority was exercised arbitrarily and capriciously.' Adwon v. Oklahoma Retail Grocers Ass'n, 204 Okl. 199, 228 P.2d 376, 379; School District No. 25 of Woods County v. Hodge, 199 Okl. 81, 183 P.2d 575."

In the case of Application of Oklahoma Capitol Improvement Authority, etc., Okl., 355 P.2d 1028, 1029, we said:

"Courts must sustain statutes, if possible, and nullify them only when they are clearly unconstitutional."

Protestants argue that "The judicial construction of 69 O.S. (1961) Sec. 680 demanded in paragraph 12 of the application is contrary to the language and intent of the statute."

Applicant and protestant Hoover do not agree as to the intent of the legislature as expressed in the phrase "until all presently outstanding bonds and the interest thereon for the Turner section of the Oklahoma Turnpike are paid in full." 69 O.S.1959 Supp. § 680.

Applicant contends that "If there should be a mere substitution of one type of bonds (e. g. refunding bonds) for the presently outstanding Turner bonds, it is equally clear that the "presently outstanding bonds" actually have thereby not been paid because the obligations on the Turner Turnpike continue to be outstanding in a slightly different form."

Protestant argues that "The Authority has now realized that under this section the apportionment would cease if 'presently outstanding bonds' were paid in full by a refunding bond issue; and so it would."

In the case of City of Bristow ex rel. Hedges et al. v. Groom et al., 194 Okl. 384, 151 P.2d 936, 940, this court said:

"The cardinal rule of statutory construction, to which all other rules are subordinate, is to ascertain the intention of the Legislature (25 R.C.L. 960), and this should ordinarily be done by a consideration of the language of the statute, * * *."

■ It would seem that the intention of the legislature in inserting this phrase was to permit the continuance of apportionments of motor fuel taxes until the revenues of the Turner Turnpike would be available for payments on bonds of other turnpikes. It seems apparent that the legislature by the passage of Senate Bill 432 purposed to facilitate, not hinder, the sale of turnpike revenue bonds. The construction called for by protestant would not be conducive to sale of bonds. We believe the legislative intent as expressed in the Act was that any refunding bonds that may be issued in exchange for or in payment of the Turner Turnpike bonds now outstanding, and interest thereon, would have to be paid in full before the apportionment herein discussed would cease or expire by operation of law.

■ Protestants state that "The project and the trust indenture contain a variety of provisions and plans which are directly and positively prohibited by the Enabling Act."

They first argue that "The indenture permits proceeds of bonds for the southwest turnpike project to be used to build another turnpike project in direct violation of 69 O.S. (1959) Sec. 659."

In 359 P.2d 680, we held that the southwestern turnpike project could be combined with the eastern project to form one project, "Southern Turnpikes" in the trust agreement. Provision is made for only

one sinking fund in connection with the southern turnpikes. We do not agree with such argument.

Protestants next argue that "The trust indenture authorizes and directs payment of portions of proceeds of the bonds as attorney fees and engineering fees, in violation of 69 O.S. (1959) Sec. 681."

The Enabling Act vests applicant with discretionary power in employing such people. There is no allegation that applicant has been guilty of an abuse of discretion. Absent such a claim of abuse, we reject the argument.

Protestants further argue that "The provisions of the trust indenture relating to a future eastern turnpike project are contrary to law."

The trust agreement does not authorize the issuance of future bonds to build all or part of an eastern turnpike. The applicant must take some formal positive action before it can undertake the construction of an eastern turnpike. Protestant then will have an opportunity to be heard with regard to the matter.

Protestants argue that "all or some of the highway projects to be built by the state highway department in connection with the southwestern turnpike project are lead roads or access roads, required to be built exclusively by the turnpike authority." We previously answered this argument in the negative in our opinion in 359 P.2d 680.

Protestants argue that "Protestant is entitled by law to take depositions of witnesses in connection with this action."

We have examined the "Statement of issues and questions of fact upon which evidence and testimony by deposition or otherwise, will be necessary or required for determination of issues herein," submitted by protestant Hoover, and heard argument of the other protestants with respect thereto. No fact questions necessitating the reference of this case to a referee are presented. Most of the issues advanced by protestants concern the discretionary power of applicant. Should the Authority abuse its discretion, in that respect, a forum, no doubt, would be available.

In 359 P.2d 680, 702 in order denying motion for rehearing and motion to vacate we said:

"We carefully considered Protestant's motion prior to and in connection with our opinion on the merits in this case and on consideration of petition for rehearing concluded that there were no decisive and controlling issues of fact mentioned or presented which would make it necessary to refer the case to a referee for the purpose of taking evidence and testimony."

In arriving at our conclusions hereinabove set forth, it has not been our intention to affect the levy of an excise tax or taxes upon the sale, storage or distribution or withdrawal from storage of gasoline imposed by 68 O.S.1951 § 659a, and comparable statutes.

We determine all the issues herein in favor of applicant.

We direct that any petition for rehearing be filed within five days of the date of promulgation of opinion herein.

BLACKBIRD, V. C. J., and WELCH, DAVISON, HALLEY, JOHNSON and JACKSON, JJ., concur.

BERRY, J., concurs in conclusion by reason of stare decisis.

IRWIN, J., concurs in part and dissents in part.

On Motions to Quash Subpoenas and for Oral Argument and on Petition for Rehearing.

WILLIAMS, Chief Justice.

Of the several protestants originally appearing in this action, Messrs. R. C. Cates, E. N. Potts, G. R. Sharpe, and Floyd Stine, only, have filed a petition for rehearing. They, only, are intended by the reference to them hereinafter appearing, i. e., as "Protestants".

Protestants assert that in this action certain claims were made by petitioner and denied by protestants and others; that the resolution of such contentions required the taking of evidence.

Protestants state that in order to substantiate the claims of others and themselves as to the true facts existent in the premises certain other litigants in this action gave notice to take depositions and requested the Chief Justice to issue subpoenas and filed a "Statement of issues and questions of fact upon which evidence and testimony by deposition or otherwise, will be necessary or required for determination of issues herein", which actions protestants adopt and join in and which "Statement of issues and questions of fact upon which evidence and testimony by deposition or otherwise, will be necessary or required for determination of issues herein" such protestants adopt.

Protestants further say that under the due process clause of the Fourteenth Amendment to the Constitution of the United States of America, they are entitled to a full and fair hearing—to their day in court—but that up to the present time they have been denied such rights in this proceeding and that they are without remedy.

Protestants further state that the decision of this court, upholding the validity of Senate Bill 432 of the Twenty-Eighth Oklahoma Legislature, the trust indenture herein involved and the proposed bonds to be issued thereunder to be paid out of certain allocation of motor fuel taxes on turnpike facilities, is erroneous and is violative of the Oklahoma Constitutional prohibition against creation of state debt, and permits Turnpike Authority to do indirectly that which it cannot do directly, to wit: To violate the Constitution of Oklahoma including Art. 10, Secs. 15, 19, 23 and 25 thereof; and that the Court further committed grievous error in failing, neglecting and refusing to hold and determine that under rule announced in Boswell case, Senate Bill No. 432, the trust indenture, and the proposed bonds are each and all illegal and unconstitutional, and that application of Turn-pike Authority should be in all respects disapproved and disallowed.

 An opinion heretofore promulgated herein, we think, sufficiently inferred that with our denial of right of protestants to take testimony, the subpoenas theretofore issued fell and became defunct. The motion of petitioner to quash subpoenas is hereby specifically sustained.

Article 10, Sec. 25, of the Oklahoma Constitution, providing for a vote of the people prior to validity of any bond issue creating any debt against the State, has no application in this case inasmuch as we have held in opinion herein that no debt was created.

Full disposition of protestants' other arguments was made in opinion.

The motion for oral argument and petition for rehearing, respectively, are denied.

IRWIN, J., dissents.